UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
(TAMPA DIVISION)

CASE NO.

SIERRA CLUB, a not-for-profit corporation, and
DAN RAMETTA, as an individual and member of
SIERRA CLUB,

      Plaintiffs,

v.

UNITED STATES ARMY CORPS OF
ENGINEERS; LT. GEN. TODD T. SEMONITE,
Commander and Chief of Engineers of the U.S. Army
Corps. of Engineers, in his official capacity; and
COLONEL ANDREW KELLY, Commander and
District Engineer of the U.S. Army Corps of
Engineers, Jacksonville District, in his official
capacity,

      Defendants.

_____/

## **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

COME NOW, Plaintiffs, SIERRA CLUB and DAN RAMETTA, by and through

undersigned counsel, and sue Defendants, UNITED STATES ARMY CORPS OF ENGINEERS,

LT. GEN. TODD T. SEMONITE, in his official capacity as Commander and Chief of Engineers of

the U.S. Army Corps of Engineers, and COLONEL ANDREW KELLY, Commander and District

Engineer of the U.S. Army Corps of Engineers, Jacksonville District, in his official capacity, for

improper agency action under the Administrative Procedures Act, 5 U.S.C. § 706, violations of the

National Environmental Policy Act, 42 U.S.C. § 4321, *et seq*., and violations of the Clean Water

Act, 33 U.S.C. §1344, and state in support as follows:

1

## **INTRODUCTION**

1.      This is an action for declaratory judgment and injunctive relief.  This action challenges the United States Army Corps of Engineers ("CORPS") decision to issue Permit No: SAJ-2011-00551 (SP-TSH), ("RRE Permit"), pursuant to the Section 404 of the Clean Water Act ("CWA"),  for the Ridge Road Extension, a roadway project spanning 8.65 miles and requiring fill material to be deposited over 42.40 acres of high quality preserved wetlands, 37.37 acres of which will be permanently impacted during the three segments of the project ("RRE Project").

2.      The CORPS issued the RRE Permit on December 20, 2019, at the request of the permit applicants, Pasco County Board of County Commissioners ("Pasco County") and the Florida Department of Transportation ("FDOT"). Ex. A.

3.      The issuance of the RRE Permit is a major Federal Action, falling under the purview of the Administrative Procedure Act ("APA"), which requires the CORPS to conduct a statutory National Environmental Policy Act ("NEPA") analysis and prepare the appropriate NEPA documents.

4.      This action alleges that the CORPS violated the APA, NEPA, and CWA, when it issued the RRE Permit.

5.      This action also challenges the sufficiency and validity of the CORPS' Environmental Assessment ("EA"), Finding of No Significant Impact ("FONSI"), and decision not to prepare, or require the preparation of, an Environmental Impact Statement ("EIS") pursuant to the requirements of NEPA and its implementing regulations.

6.      The CORPS cannot justify its decision to issue the RRE Permit. The issuance of the RRE Permit, under the circumstances, is unreasonable, arbitrary, capricious, not in the public interest, and otherwise not in accordance with federal law.

7.     Fundamentally, the RRE Permit is being issued:

    (a) without the required analysis of the direct and indirect impacts to wildlife, their habitats, and wetlands, as analysis was not based upon the most recent and accurate data;

    (b) without the required analysis of cumulative impacts of all reasonably foreseeable projects in the affected area, including the Suncoast Parkway, the Suncoast Parkway II, and the future widening of the Ridge Road Extension from four lanes to six lanes;

    (c) without inclusion of public comments prior to 2011 in the record of decision, despite assurances to members of the pubic, including members of Plaintiff SIERRA CLUB, that all comments would be considered and included in the record; and

    (d) without a public hearing, despite numerous requests for a public hearing, nor a sufficient basis for failing to hold a public hearing as required by federal law.

8.     The CORPS' failure to follow NEPA's procedural mandates is arbitrary and capricious under the APA.

9.     In addition, the only alternatives deemed practicable by the CORPS required buildout over wetlands and through the Serenova Tract of the Starkey Wilderness Preserve, despite applicant Pasco County's admission that there are other alternatives that may exist but were not requested to be included in the alternatives analysis for their practicability.

10.   The Serenova Tract of the Starkey Wilderness Preserve is set aside for mitigation of impacts of the Suncoast Parkway and all alternatives deemed practicable by the CORPS included a buildout over these wetlands, demonstrating **that it is not the least environmentally damaging route**; and

despite the public outcry the agency failed to incorporate public comment into its analysis and failed to hold a public hearing without a sufficient basis.

11.   The CORPS' failure to follow CWA's procedural mandates is arbitrary and capricious under the APA.

12.   The CORPS conducted an Environmental Assessment for the RRE Project, made a Finding of No Significant Impact,  and declined to prepare an Environmental Impact Statement. This decision, under the circumstances, is unreasonable, arbitrary, capricious, and otherwise not in accordance with federal law.

13.   The CORPS' EA unlawfully is based upon insufficient data to correctly identify the direct, indirect, and cumulative adverse impacts and:

   a)  fails to adequately evaluate the direct, indirect, and cumulative harm to threatened and endangered species, their habitat, and wetlands located within the RRE Permit area of impact;

   b)  fails to note, acknowledge, or factor into the analysis the significant public comments made prior to 2011;

   c)  failed to provide a public hearing on the controversial project;

   d)  fails to adequately identify and properly evaluate alternatives for the RRE Project; and

   e)  fails to adequately identify the degree of mitigation necessary to off-set the direct, indirect, and cumulative impacts of the RRE Project.

14.   Based upon the foregoing, the CORPS' wholly inadequate and legally deficient EA cannot properly form the basis for the FONSI decision, the decision not to prepare an EIS, the decision to not hold a public hearing, or the decision to issue the RRE Permit under applicable Federal laws.

15.    Accordingly, Plaintiffs request that this Honorable Court: (1) declare that the CORPS' issuance of the RRE Permit is in violation of NEPA, the CWA, and the APA; (2) set aside the RRE Permit; and (3) enjoin the CORPS from authorizing any further agency action under the RRE Permit, including allowing construction by the applicants, until it lawfully complies with the statutory and regulatory demands of NEPA, the CWA, and the APA.

## JURISDICTION

16.    This Honorable Court has jurisdiction over this civil action pursuant to the following federal laws: 28 U.S.C. § 1331; 5 U.S.C. §§ 701-706; 28 U.S.C. § 1361; 28 U.S.C. § 2201; and 28 U.S.C. § 2202.

17.    An actual justiciable controversy now exists between the parties in which Plaintiffs are entitled to the relief sought herein to redress the harm Plaintiffs are suffering and would otherwise continue to suffer if such relief were not granted.

18.    The Defendants' actions are final and ripe for review and Plaintiffs have standing to bring these claims to be reviewed by this Honorable Court pursuant to 5 U.S.C. § 702.

## VENUE

19.    Venue is proper in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(e) as the actions giving rise to this claim and its effects occur in the Middle District of Florida, and it is a civil action against the Defendants as an agency and officers / employees of an agency of the United States acting in their official capacities. The affected area is in Pasco County, Florida.

**PARTIES**

*PLAINTIFF SIERRA CLUB*

20. Plaintiff SIERRA CLUB is a California non-profit public interest membership organization dedicated to fighting for environmental and social justice. SIERRA CLUB's mission is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

21. As of November 2019, SIERRA CLUB has 37,888 members in Florida, with 2,933 members in Pinellas County, 766 members in Pasco County, and 2,140 members in Hillsborough County.

22. SIERRA CLUB also has many supporters in Florida, whom donate financially but are not registered members, with 7,410 supporters in Pinellas County, 2,749 supporters in Pasco County, and 6,087 supporters in Hillsborough County.

23. SIERRA CLUB also has a Suncoast Group and Save Our Serenova Coalition, a petition on Change.org opposing the Ridge Road Extension, with over 2,145 signatures and counting as of January 16, 2020, a print petition with 2,700 signatures and counting as of January 16, 2020, as well as a Save Our Serenova Facebook page with over 3,595 likes and over 3,500 followers as of January 16, 2020.

24. SIERRA CLUB and its members are involved extensively in the preservation of the Starkey Wilderness Preserve, including the Serenova Tract, which is the ecosystem upon which federal listed species including the Eastern Indigo Snake, Gopher Tortoise, Florida Scrub Jay, Red-Cockaded Woodpecker, numerous other listed and threatened species, and their wetland habitats depend, that would be significantly degraded by the Ridge Road Extension project.

25.  SIERRA CLUB has members who regularly use and enjoy the Starkey Wilderness Preserve, including the Serenova Tract, and other areas where these species are known to reside, and intend to do so continuously in the future. SIERRA CLUB frequently leads organizational outings into the Starkey Wilderness Preserve, including the Serenova Tract, that are open to SIERRA CLUB members and supporters for camping and hiking.

26. SIERRA CLUB's members use the Serenova Tract for observation of these listed species and other wildlife, research, nature photography, aesthetic enjoyment, recreation, education, bird counts, and other activities. Plaintiff's members derive professional, aesthetic, spiritual, recreational, economic, informational, and education benefits from the observation of these species and their habitat, within the Starkey Wilderness Preserve, including the Serenova Tract. These members have concrete plans to continue visiting and recreating in areas where they can observe these listed species and their habitat, within the Starkey Wilderness Preserve, including the Serenova Tract.

27. SIERRA CLUB and its members have submitted numerous comment letters in opposition to the Ridge Road Extension and requests for a public hearing between 2000 and 2019. The CORPS failed to include all comment letters, and requests for public hearing, specifically those prior to 2011, into the official administrative record.

28. SIERRA CLUB and its members' interests are adversely affected by the CORPS' failure to comply with the APA, CWA, and NEPA.

29. SIERRA CLUB and its members also have procedural interests in seeing the CORPS comply with its legal obligations and suffers procedural injury from the CORPS' failure to do so.

30. The injuries described above are actual, concrete injuries presently suffered by SIERRA CLUB and its members, and the injuries will continue to occur unless this Court grants the requested relief.

*PLAINTIFF DAN RAMETTA*

31. Plaintiff DAN RAMETTA is an individual of the age of majority, who resides in Pasco County, Florida.

32. DAN RAMETTA has been, and remains, a member of SIERRA CLUB since 2000. Additionally, RAMETTA is a member and Director of Citizens for Sanity.com Inc. and Citizens for Sanity, Pasco County, Inc., Florida based non-profits whose purposes are, in pertinent part, to support the citizens of Pasco County by fostering a spirit of cooperation with government entities, citizen groups, homeowners and civic associations, and the general public to increase the awareness of the need for sustainable growth and environmental stewardship, thereby ensuring an improved quality of life for all Pasco County citizens; to provide education for elected and appointed officials, community and business leaders, and the general public with regard to the environment, present and future development, and the overall quality of life in Pasco County and neighboring counties; and to promote scientific research supporting the wise use of natural resources and community planning techniques in support of sustainable growth.

33. DAN RAMETTA has participated in Sierra Club outings into the Starkey Wilderness Preserve, including the Serenova Tract.

34. DAN RAMETTA educates and encourages the public to utilize the Starkey Wilderness Preserve, including the Serenova Tract, specifically lower middle and lower economic classes and the severely handicapped, especially biplegic and quadriplegic United States Military veterans as these individuals are the most dependent on the Serenova Tract as part of the Starkey Wilderness Preserve as a place of relaxation, recreation, emotional and physical recuperation, affordable family vacations, and for wounded veterans, semiannual turkey and deer hunts and ADA accessible trails.

35. DAN RAMETTA has personally engaged in observation of wildlife, research, nature photography, aesthetic enjoyment, recreation, education, bird habitat assessments, and other activities in the Starkey Wilderness Preserve, including the Serenova Tract, and intends to continue to do so in the future.

36. DAN RAMETTA derives professional, aesthetic, spiritual, recreational, economic, informational, and education benefits from the observation of wildlife and their habitat, within the Starkey Wilderness Preserve, including the Serenova Tract.

37. DAN RAMETTA has concrete plans to continue visiting, recreating, and participating in Sierra Club outings in areas where he can observe these species and their habitat, within the Starkey Wilderness Preserve, including the Serenova Tract.

38. DAN RAMETTA reasonably fears that the Ridge Road Extension will significantly degrade his ability to continue enjoying, as well as continue to educate and encourage the enjoyment of, the Starkey Wilderness Preserve, including the Serenova Tract, as it will add vehicular noise, emissions, fumes, leaking oil and other fluids that will then wash into ditches and inevitably pollute the streams and rivers used for recreational fishing as well as degrading the habitat of the many species dependent upon the Starkey Wilderness Preserve, including the Serenova Tract.

39. DAN RAMETTA has submitted numerous comment letters in opposition to the Ridge Road Extension permit and requests for a public hearing between 2000 and 2019. The CORPS failed to include all comment letters, and requests for public hearing, prior to 2011 into the official administrative record.

40. DAN RAMETTA's interests are adversely affected by the CORPS' failure to comply with the APA, CWA, and NEPA.

41. DAN RAMETTA also has procedural interests in seeing the CORPS comply with its legal obligations and suffers procedural injury from the CORPS' failure to do so.

42. The injuries described above are actual, concrete injuries presently suffered by DAN RAMETTA and the injuries will continue to occur unless this Court grants the requested relief.

*DEFENDANT UNITED STATES ARMY CORPS OF ENGINEERS AND OFFICIALS*

43.   Defendant UNITED STATES ARMY CORPS OF ENGINEERS is an agency of the United States federal government, and a subdivision of the U.S. Department of the Army, which is in the U.S. Department of Defense, which may be named as a defendant and against which a writ in the nature of mandamus, a declaratory judgment, and injunctive relief may be entered, pursuant to 28 U.S.C. §§ 1361, 2201, 2201, and Fed. R. P. 57, and 65(a).

44.   The CORPS is responsible for, among other things, regulating the placement of dredged and fill material into navigable waters and, in doing so, must meet all environmental standards and requirements. *See* 33 U.S.C. § 1344(a).

45.   The CORPS is the action agency for purposes of environmental review under the CWA, NEPA, and the ESA.

46.   Defendant LT. GEN. TODD T. SEMONITE is Commander and Chief of Engineers for the United States Army Corps of Engineers and is responsible for ensuring that the CORPS complies with the requirements of the CWA, NEPA, ESA, and the APA.

47.   Defendant COLONEL ANDREW KELLY is the District Commander for the Jacksonville District of the U.S. Army Corps of Engineers and is responsible for ensuring that the CORPS complies with the requirements of CWA, NEPA, ESA, and the APA.

48.   Defendants UNITED STATES ARMY CORPS OF ENGINEERS, LT. GEN. TODD T. SEMONITE, in his official capacity as Commander and Chief Engineer, and COLONEL ANDREW KELLY, in his official capacity as Commander and District Engineer, have waived sovereign immunity pursuant to 5 U.S.C. § 702, 33 U.S.C. § 1365, and 16 U.S.C. § 1540(g).

## STATUTORY AND REGULATORY FRAMEWORKS

### *ADMINISTRATIVE PROCEDURE ACT*

49.   Pursuant to the Federal Administrative Procedures Act, 5 U.S.C. § 701, *et seq*., any person who has suffered legal wrong because of agency action, or who is adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

50.   5 U.S.C. § 706 requires that "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."

51.   The APA also requires a reviewing court to:

(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be:

(A) **arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law**;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) **without observance of procedure required by law**;

(E) **unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute**; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

*Id.* at § 706(1)-(2) (emphasis added).

52.   In making the foregoing determinations, the court can review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error. *Id.* at § 706.

53.   An agency's finding of no significant impact and decision to not prepare an EIS under NEPA is a final administrative decision reviewable under the Administrative Procedures Act. *See* 5 U.S.C. § 701 *et seq.*

54.   Here, the CORPS' EA, FONSI, and decision not to prepare an EIS under NEPA are final agency actions reviewable under the APA. *See* 5 U.S.C. § 704.

55.   The CORPS' issuance of Permit No. SAJ-2011-00551 (SP-TSH), is a final agency action reviewable under the APA. *Id.*

*NATIONAL ENVIRONMENAL POLICY ACT*

56.   The National Environmental Policy Act is the Nation's charter for protection of the environment. 40 C.F.R. § 1500.1(a). Its central goals are "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation . . . ." 42 U.S.C. § 4321.

57.   Furthermore, in order for the national policy to be carried out it is the federal government's responsibility to "***use all practicable means***, consistent with other essential considerations of national policy, to ***improve and coordinate*** Federal plans, functions, programs, and resources to the end that the Nation may:

(1) fulfill the responsibilities of each generation *as trustee of the environment for succeeding generations*;

(2) assure for all Americans safe, healthful, productive, and *esthetically and culturally pleasing surroundings*;

(3) attain the *widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences*;

(4) *preserve important historic, cultural, and natural aspects of our national heritage*, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) *achieve a balance between population and resource use* which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

42 U.S.C. § 4331 (b) (emphasis added).

58.  NEPA is designed to "insure that environmental information is available to public officials and citizens before decisions are made and actions are taken," and to "help public officials make decisions that are based on understanding of environmental consequences . . ." 40 C.F.R. § 1500.1(b)-(c) (emphasis added).

59.  Pursuant to 42 U.S.C. § 4342, Congress created the Council on Environmental Quality ("CEQ") for the purpose of promulgating regulations applicable to all federal agencies consistent with the intent and purposes of NEPA. 40 C.F.R. § 1500 *et seq*.

60.  Under CEQ regulations, federal agencies are required to prepare an Environmental Assessment to assess the impacts of major federal actions to determine if those actions will significantly affect the human environment.

61.   "Major Federal action" includes "actions with effects that may be major and which are potentially subject to Federal control and responsibility."  40 C.F.R. § 1508.18.

62.   NEPA regulations provide guidance on evaluating the significance of an action's impact and list considerations when determining the intensity of an impact in pertinent part:

> (2) The degree to which the proposed action affects public health or safety.

> (3) Unique characteristics of the geographic area such as **proximity to historic or cultural resources,** park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

> (6) **The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration**.

> (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. **Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.**

> (8) **The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural or historical resources.**

> (9) The degree to which the **action may adversely affect and endangered or threatened species or its habitat** that has been determined to be critical under the Endangered Species Act of 1973.

> 40 C.R.F. § 1508.27 (emphasis added).

63.   To comply with NEPA, federal agencies are initially required either to prepare an Environmental Impact Statement if it is apparent that the action will "significantly" affect the human environment, or if the action's effects are unclear, first prepare an Environmental Assessment to determine whether the significance of the effects establishes that a more extensive EIS analysis is necessary. *Id.* at §§ 1501.4; 1508.9.

64.   NEPA requires all agencies of the federal government to prepare an EIS regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The purpose of an EA is to determine whether the agency must prepare and EIS.  40 C.F.R. § 1501.4(b).  If the EA results in a finding that an action will likely adversely affect the human environment, a federal agency is required to prepare an EIS.

65.   According to NEPA, the EIS must describe (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) alternatives to the proposed action, (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity," and (5) any "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented."  *Id*. at § 4332.

66.   Furthermore, NEPA mandates that when "an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is ***incomplete or unavailable information, the agency shall always make clear that such information is lacking***." 40 C.F.R. § 1502.22 (emphasis added); *see also Nw. Ecosystem All. v. Rey*, 380 F. Supp. 2d 1175, 1195 (W.D. Wash. 2005) ("Relying on outdated data or not acknowledging the limitations in a methodology are grounds for setting aside an EIS.)

67.   To conclude an EIS is unnecessary, the reviewing agency must find that there will be no significant impact on the human environment from the proposed agency action. 40 C.F.R. §§ 1508.9; 1508.13.  The "human environment" is defined "comprehensively to include the natural and physical environment and the relationship of people with that environment." *Id.* at § 1508.14.

68.   "Significance," as defined by NEPA regulations, "requires considerations of both context and intensity." 40 C.F.R. § 1508.27. "Context" means, in the case of a site-specific action, "the effects in the locale rather than in the world as a whole.  Both short- and long-term effects are relevant."  *Id.* "Intensity" refers to "the severity of impact." *Id.*

69.   If an agency's actions are "significant" according to any of the listed criteria in 40 C.F.R. § 1508.27, then the federal agency erred in failing to prepare an EIS.

70.   Public controversy surrounding the potential impacts of a federal agency action strongly suggests that an action is significant and requires preparation of an EIS.  *Id.* at § 1508.27(b)(4), (5).

71.   Controversy sufficient to require preparation of an EIS occurs when substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor or there is a substantial dispute about the size, nature, or effect of the major Federal action.

72.   NEPA's implementing regulations require that the federal agency proposing an action hold a public hearing "whenever appropriate" taking into account factors such as "substantial environmental controversy concerning the proposed action or substantial interest in holding hearing." *Id.* at § 1506.6(c)(1).

73.   Federal officials, agencies, and courts share responsibility for enforcing NEPA and guaranteeing that high quality information is available to the public and analyzed before federal agencies make decisions and take actions that may be irreversible. 40 C.F.R. § 1500.1(a).

74.   In addition to the EIS requirement, each federal agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E).

75. An agency must "rigorously explore and objectively evaluate all reasonable alternatives," including alternatives that are "not within the jurisdiction of the [] agency." 40 C.F.R. § 1502.14(a-c). In addition, an agency "shall state how alternatives . . . will or will not achieve the requirements of section 101 and 102(1) of the Act" which requires agencies to "use all practicable means" to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings" and to "preserve important historic, cultural, and natural aspects of national heritage" as well as how alternatives "will or will not achieve the requirements of . . . other environmental laws and policies." 40 C.F.R. § 1502.2(d).

76. Until an agency issues a Record of Decision pursuant to NEPA, no action concerning a proposal may be taken that would have an adverse environmental impact or limit the choice of reasonable alternatives. 40 C.F.R. § 1506.1(a).

77. Although the CORPS' primary function in issuing section 404 permits under the CWA is to protect the integrity of the waters of the United States, 33 U.S.C. § 1251(a), like any other federal agency taking action that could affect the human environment, its NEPA analysis relating to section 404 permits must include consideration of reasonably foreseeable, direct, indirect and cumulative impacts to the natural and physical environment, not just impacts to wetlands. 40 C.F.R. § 1508.14.

78. Federal agencies must include discussions of "indirect" and "cumulative effects/impacts and their significance in an EIS. *Id*. § 1502.16(b).

79. Indirect effects are:

> caused by the action and are ***later in time or farther removed in distance, but are still reasonably foreseeable.*** Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

*Id. at* § 1508.8(b) (emphasis added).

80.   Possible indirect impacts also include effects on natural resources and on the components, structures, and functioning of affected ecosystems, as well as aesthetic, historic, cultural, economic, social, or health impacts. *Id*. at § 1508.8.

81.   "Cumulative impacts" are defined as:

> the impact on the environment which results from the incremental impact of the action ***when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.*** Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

*Id.* at § 1508.7.

82.   NEPA mandates that federal agencies analyze the indirect and cumulative effects of proposed actions to the extent they are reasonably foreseeable consequences of the proposed action, regardless of where or when or those impacts might occur and take a "hard look" at the environmental consequences of their actions.

83.   To satisfy NEPA's "hard look" requirement, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*citing Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

84.   Taking a "hard look" includes requiring that environmental effects are "discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989).

85.   Neither NEPA nor CEQ's regulations implementing the procedural provisions of NEPA allows federal agencies to analyze effects of their actions wearing blinders.

86.   Rather, the entire body of NEPA law directs federal agencies to analyze the effects of proposed actions to the extent they are reasonably foreseeable consequences of the proposed action, regardless of where those impacts might occur.

87.   Agencies must analyze indirect effects, which are caused by the action, are later in time or farther removed in distance, but are still reasonably foreseeable, including growth-inducing effects and related effects on the ecosystem, in conjunction with the direct, indirect and cumulative effects.

88.   Furthermore, NEPA requires that the issuing agency conduct an independent analysis of the impacts. *Pac. Coast Fed'n of Fishermen's Associations v. U.S. Dep't of the Interior*, 929 F. Supp. 2d 1039, 1056–57 (E.D. Cal. 2013) ("These requirements [under NEPA] suggest that once an agency elects to prepare an EA, the EA is subject to independent review, even if it has already been determined that no EIS is required. *See Natural Res. Def. Council, Inc. v. U.S. Forest Serv.*, 634 F.Supp.2d 1045, 1059–60 (E.D.Cal.2007) (requiring consideration of alternatives, albeit a more limited number, in an EA, even where EIS is not required); *Sabine River Auth. v. U.S. Dept. of Interior*, 745 F.Supp. 388, 394 (E.D.Tex.1990), *aff'd*, 951 F.2d 669 (5th Cir.1992) (independently analyzing challenges to the content of an EA after rejecting challenge to agency's failure to prepare EIS on the ground that the project did not alter the status quo)).

89. Finally, the issuing agency has a duty to continue reviewing environmental effects of a proposed action even after its initial approval. *See Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 371 (1989)(" It would be incongruous with this approach to environmental protection, and with the Act's manifest concern with preventing uninformed action, for the blinders to adverse environmental

effects, once unequivocally removed, to be restored prior to the completion of agency action simply because the relevant proposal has received initial approval.").

*CLEAN WATER ACT*

90.   The Clean Water Act established two permitting programs for authorizing the discharge of pollutants into waters of the United States – sections 402 and 404.

91.   The section 402 permit program, called the National Pollution Discharge Elimination System and administered by the Environmental Protection Agency, authorizes the issuance of permits for the discharge of all pollutants except those regulated under section 404. 33 U.S.C. § 1342.

92.   Section 404 authorizes the CORPS to issue permits for the discharge of "dredged or fill materials," but only after providing "notice and opportunity for public hearings." *Id.* at § 1344.

93.   There are two sets of implementing regulations that govern the 404 permit program under 33 C.F.R. § 320.4(b)(4)  - one that was promulgated by the CORPS itself, 33 C.F.R. Parts 320-330, and one that was promulgated by the Environmental Protection Agency ("EPA"), called the "404 Guidelines."  40 C.F.R. §§ 230.1-230.80.

94.   Under the CORPS' regulations, an applicant for a 404 permit must include in the permit application all activities which it plans to undertake which are "reasonably related" to the project, along with a complete description of such activities "sufficient for public notice." 33 C.F.R. § 325.1(d)(2).

95.   When the CORPS receives a complete application, it must issue a public notice soliciting comments from interested persons as to the advisability of granting the permit. 33 U.S.C. § 1344(a); 33 C.F.R. §§ 325.2(a)(2), 325.3.

96.   The CORPS' rules further provide that "[a] public hearing will be held in connection with the consideration of a [dredge and fill permit] whenever a public hearing is needed for making a decision on" the permit application. 33 C.F.R. § 327.4(a).

97.   Requests for a public hearing "shall be granted, unless the district determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing," 33 C.F.R. § 327.4(a), but "[i]n case of doubt, *a public hearing shall be held*." 33 C.F.R. § 327.4(c) (emphasis added).

98.   The "public hearings" language in section 404 was, in fact, written into the statute to protect the public, not permit applicants. *Buttrey v. United States*, 690 F.2d 1170, 1176 (5th Cir. 1982).

99.   In performing its substantive review of permit applications, the CORPS is required to give wetlands, such as those found in the Serenova Tract and adjacent to the Starkey Wilderness Preserve, the highest possible level of protection.  33 C.F.R. § 320.4(b) ("[W]etlands constitute a productive and valuable public resource, the unnecessary alteration and destruction of which should be discouraged as contrary to the public interest."); *see also, Buttrey v. United States*, 690 F.2d 1170, 1180 (5th Cir.1982), cert. denied, 461 U.S. 927 (1983) ("It would hardly be putting the case too strongly to say that the Clean Water Act and the applicable regulations do not contemplate that wetlands will be destroyed simply because it is more convenient than not to do so.").

100.   The regulations list seven wetland functions that are "important to the public interest."  33 C.F.R. § 320.4(b). These include (a) "[w]etlands which serve significant natural biological functions, including food chain production, general habitat and nesting, spawning, rearing and resting sites for aquatic or land species," and (b) "[w]etlands which are unique in nature or scarce in quantity to the region or local area." 33 C.F.R. § 320.4(b)(2).

101.  The regulations further provide that a permit may not be granted to work in wetlands identified as "important" under these criteria unless the CORPS finds that under its public interest review, "the benefits of the proposed alteration outweigh the damage to the wetlands resource," and "the proposed alteration is necessary to realize those benefits."  33 C.F.R. § 320.4(b)(4).

102.  In making these determinations, the CORPS must consider "[a]ll factors which may be relevant to the proposal," including "the cumulative effects" of the project.  *Id.*; 33 C.F.R. § 320.4(a).

103.  The CORPS must also consult with the U.S. Fish and Wildlife Service ("FWS") "with a view to the conservation of wildlife resources by prevention of their direct and indirect loss and damage due to the activity proposed in a permit application," and it must give "full consideration" to the views of the FWS "in deciding on the issuance, denial, or conditioning of individual or general permits." 33 C.F.R. § 320.4(c).

104.  The obligation to consult is a continuing one.  Whenever, federal involvement with a project is continuing, as is in this permit, "[r]einitiation of formal consultation *is required and shall be requested* [by the agency] … (b) [i]f new information reveals effects of the action that may affect listed species in a manner and to an extent not previously considered." 50 C.F.R. § 402.16(b) (emphasis added).

105.  The EPA's "guidelines" for the issuance of dredge and fill permits are also binding on the CORPS. 40 C.F.R. Part 230; 33 C.F.R. § 320.4(b)(4).

106.  Those guidelines also articulate a strong, pervasive presumption against allowing any damage to wetlands: "**From a national perspective, the degradation or destruction of . . . wetlands is considered to be among the most severe environmental impacts**." 40 C.F.R. § 230.1(d) (emphasis added).

107. "The guiding principle should be that degradation or destruction of [wetlands] may represent an irreversible loss of valuable aquatic resources." *Id.*

108. Thus, the guidelines provide that "dredged or fill material should not be discharged into the aquatic ecosystem [wetlands], unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact *either individually or in combination with known and/or probable impacts of other activities* affecting the ecosystems of concern."  *Id.* § 230.1(c) (emphasis added).

109. The EPA guidelines further provide that the CORPS may not issue a dredge and fill permit "which will cause or contribute to significant degradation of [wetlands]," 40 C.F.R. § 230.10(c), and that effects "contributing to significant degradation considered individually or collectively, include . . . loss of fish and wildlife habitat . . . ." 40 C.F.R. §§ 230.10(c)(3).

110. The EPA's guidelines also strictly prohibit the CORPS from issuing any permit "if there is a practicable alternative . . . which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a) (emphasis added).

111. An alternative is considered "practicable" if it is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10 (a)(2).

112. Practicable alternatives are presumed to be available unless "clearly demonstrated otherwise" 40 C.F.R. § 230.10(a)(3).

113. In further analyzing "practicable alternatives," the CORPS must determine whether a project is "water dependent." A project that "does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose" is "not 'water dependent.'" 40 C.F.R. § 230.10(a)(3).

114. If a dredge or fill permit application does not concern a water-dependent project, the CORPS assumes that practicable alternatives exist that have less adverse impact on the aquatic ecosystem, unless the applicant "clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3). *See also, Buttrey*, 690 F.2d at 1180 (holding that this presumption of practicable alternatives "is very strong"); *Bersani v. Robichaud*, 850 F.2d 36, 44 (2d Cir.1988), cert. denied, 489 U.S. 1089 (1989) (holding that this presumption "creates an incentive for developers to avoid choosing wetlands when they could choose an alternative upland site.").

115. The CORPS' burden in finding the least damaging practicable alternative under the CWA guidelines is heaviest for non-water dependent projects planned for a "special aquatic site," such as a wetlands area. *See Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1524 (10th Cir.1992).

116. In the event that a federal action is being proposed within a sanctuary or a refuge, there are additional impacts that must be considered in making the factual determination of compliance or noncompliance with the EPA Guidelines set forth in 40 C.F.R. § 230.10.

117. EPA Guidelines describe a sanctuary or refuge as an area "designated under State or Federal laws or local ordinances to be managed principally for the preservation and use of fish and wildlife resources." 40 C.F.R. § 230.40(a).

118. When a project is slated to go through a sanctuary or refuge there are possible losses of value that must be considered in the NEPA analysis as impacts from discharges of dredged or fill material will cause:

> (a) disruption to the breeding, spawning, migratory movements or other critical life requirements of resident or transient fish and wildlife resources;
>
> (b) creation of unplanned, easy, and incompatible human access to remote aquatic areas;
>
> (c) creation of the need for frequent maintenance activity;

    (d) establishment of undesirable competitive species of plants and animals;

    (e) changes in the balance of water and land areas needed to provide cover, food, and other fish and wildlife habitat requirements in a way that modifies sanctuary or refuge management practices; and

    (f) any other adverse impacts discussed in subparts C and D of the EPA Guidelines as they relate to a particular sanctuary or refuge.

40 C.F.R. § 230.40(b)(1)-(6).

119.  The burden of proof to demonstrate compliance with the § 404(b) permit Guidelines rests with the applicant, and where insufficient information is provided to determine compliance, the Guidelines require that no permit be issued. 61 Fed.Reg. 30,990, 30,998 (June 18, 1996) (citing 40 C.F.R. § 230.12(a)(3)(iv)).

120.  Furthermore, an unowned alternative site that can reasonably be obtained is a "practicable alternative" the CORPS must consider prior to granting a dredge and fill permit. *City of Shoreacres v. Waterworth*, 420 F.3d 440, 449 (5th Cir. 2005).

121.  Issuance of a permit with insufficient information concerning alternative alignments arbitrary and capricious. *Utahns for Better Transp. v. U.S. Dep't of Transp*., 305 F.3d 1152, 1187 (10th Cir. 2002), as modified on reh'g, 319 F.3d 1207 (10th Cir. 2003).

## FACTS COMMON TO ALL COUNTS

*STARKEY WILDERNESS PRESERVE*

122.  The Ridge Road Extension project area includes special aquatic sites and preserves in the form of wetlands, which are located in and connected to the Starkey Wilderness Preserve.

123. According to the Southwest Florida Water Management District, the Starkey Wilderness Preserve is one of the largest undeveloped tracts in Pasco County and protects sensitive environmental areas in the fast-growing western portion of Pasco County.

124. The preserve consists of three tracts: Jay B. Starkey Wilderness Park, Serenova Tract, and Anclote River Ranch Tract.

125. The 2,300 acres of wetland communities in Serenova combine with the wetlands in the Jay B. Starkey Wilderness Park to form a connected 6,000-acre wetland ecosystem spread throughout approximately 19,000 acres of conservation lands.

126. Public acquisition of these lands has maintained this large wetland system as a functioning intact ecosystem. This vast network of scattered wetlands become interconnected during periods of high water levels and serves as a vital life cycle linkage for many wetland dependent species.

127. This preserve serves as a natural buffer for one of the region's main freshwater resources, the Pithlachascotee River. The lands protect water quality by acting as a natural filter of surface water as it flows across the landscape into the Pithlachascotee River and the Anclote River. The Preserve also serves as a recharge area for a regional well field operated by Tampa Bay Water that is an essential component of the multi-county water supply system that supplies drinking water to the greater Tampa Bay area.

128. In addition, these wetlands assure that the Gulf of Mexico receives the clean fresh water that is needed to maintain the long-term health of the coastal estuaries. Without a source of clean fresh water, the estuaries could not serve as the vital link in the life cycle of numerous species of birds; aquatic plants, such as seagrass; and popular fish species, such as redfish, sea trout and mullet.

*SERENOVA TRACT – PRESERVATION / MITIGATION*

129. In the 1990s, the Serenova Tract, located in the Starkey Wilderness Preserve, was transferred to the ownership of the South West Florida Water Management District ("SWFWMD") as wetland impact compensation and mitigation for the impacts of the Suncoast Parkway.

130. In March of 1997, SWFWMD and Pasco County entered into an agreement relating to the Ridge Road Extension, recognizing the purchase of the Serenova Property by Florida Department of Transportation for the purpose of environmental preservation and mitigation; recognizing Pasco County's intent to construct a "***four-lane thoroughfare*** roadway known as Ridge Road Extension;" to "provide assurance to the County that its interest will be fully and appropriately considered" by SWFWMD in the permitting evaluation and mitigation requirements of the proposed Ridge Road Extension; and to secure SWFWMD's support for the Serenova Property as a compatible mitigation area. Ex. B at pp. 1-2 (emphasis added).

131. The agreement specifically states that if construction were to occur, the proposed Ridge Road Extension would be "an ***ultimate four-lane collector roadway***" with a "***minimum right-of-way width [of] two hundred and fifty feet (250')***, unless otherwise agreed upon. Ex. B § 4 (emphasis added).

132. The agreement does not allow for any modification, amendment, or alternation of the terms or conditions, unless expressed in a written document with the same formality and of equal dignity; and that if any provision was found to be invalid, it shall be considered deleted and not invalidate the remaining provisions. *Id.* at §§ 14-15.

133. In March of 1998, the FDOT and SWFWMD entered into an agreement relating to preservation and mitigation property for the Suncoast Parkway I, to be used by SWFWMD for preservation purposes and as mitigation from construction activities. Ex. C.

134. The March 1998 Preservation Agreement conveyed a conservation easement, which included an exception for land located within the preservation/mitigation property for "the future construction of an ***arterial 4 lane collector roadway***, currently known as the Ridge Road," and upon the <u>condition</u>

that "permission of the U.S. Army Corps of Engineers, United States Fish and Wildlife Service, United States Environmental Protection Agency, the Florida [Fish and Wildlife Conservation] Commission and SWFWMD, ***shall be obtained by the entity requesting the exception of the Conservation Easement***." *Id.* at § 5 (emphasis added).

*PERMIT HISTORY*

135.  In 1998, Pasco County and FDOT applied to the CORPS for a permit under Section 404 of the CWA to fill wetlands in relation to the RRE Project.

136.  Pasco County submitted a permit application to SWFWMD in relation to the RRE Project.

137.  The permit application to SWFMWD sought approval for drainage to accommodate future expansion of Phase I from four (4) lanes to six (6) lanes.

138.  In February of 2000, the CORPS issued the first Public Notice.

139.  Plaintiffs SIERRA CLUB and DAN RAMETTA submitted public comments and requests for public hearing in response to the CORPS' Public Notice.

140. On April 4, 2000, and August 1, 2000, the FWS submitted correspondence to the CORPS recognizing that the project was a "4-lane divided highway…with potential for future expansion to 6- lanes," Ex. D and Ex. E respectively, thereby demonstrating the CORPS' knowledge of the proposed future widening of Phase I to an ultimate 6-lanes, and complete failure to analyze of the impacts that could potentially result from a 6-lane highway.

141. Also in the letter dated August 1, 2000, the FWS lists a number of deficiencies and concerns with the proposed RRE Project including, but not limited to, the bisecting of the Serenova Preserve, which is noted as an important link in maintaining habitat connectivity in the region, and was why the "Serenova was an appropriate measure to offset the adverse effects of habitat loss and

fragmentation which resulted from the construction of the Sun Coast Parkway." Ex. E at p. 3.

142. The FWS also noted that the "bisection of the Serenova Preserve by the proposed roadway would compromise the above-mentioned ecological values for which the property was purchased…*render the compensatory mitigation of the Sun Coast Parkway project ineffective*, meaning that the adverse impacts of the proposed Ridge Road project would *include the unmitigated adverse impacts of the Sun Coast Parkway project as well as the project-specific adverse impacts*." *Id.* (emphasis added).

143. On March 21, 2002, the EPA submitted correspondence to the CORPS regarding the proposed RRE Project, advising that it was understood that "for Phase II the basic project purpose is to provide access for development," and it was the EPA's opinion "that less damaging alternatives exist for these purpose." Ex. F at p. 1.

144. The EPA concluded, "*[s]ince the Serenova Track has been set aside for management as a natural area in perpetuity, there is no reason to construct a road for development through a preserve area.*" *Id.* at p. 2 (emphasis added).

145. On October 20, 2004, Pasco County submitted a report to the CORPS to detail minimization efforts for the proposed RRE Project and clearly stated that the "[m]edian widths used were the minimum required *based on future widening of Phase I to 6 lanes*…The 64' wide median was selected *to allow for future widening of the roadway to six lanes without the need for the introduction of median barrier or a reduction in the design speed*," Ex. G at p. 4 (emphasis added), thereby evidencing the CORPS' knowledge of the proposed future widening of Phase I to an ultimate 6-lanes, and complete failure to include an analysis of the impacts that could potentially result from a 6-lane highway.

146. On December 27, 2004, the FWS submitted correspondence to the CORPS regarding the proposed RRE Project advising that the FWS believed that the construction "through the Serenova tract represents a substantial and unacceptable adverse impact to aquatic resources of national importance…***constructing the road through the Serenova track would render the compensatory mitigation for the Sun Coast Parkway project ineffective***." Ex. H at p. 1 (emphasis added).

147. Furthermore, the FWS advised that "**any development which would be unlikely to occur but for the construction of the Ridge Road, must be considered an indirect effect of the proposed action and should be addressed in the report**." *Id.* at p. 2 (emphasis).

148. On December 18, 2007, during coordination for the permit application for the Ridge Road Extension, the FWS informed the CORPS that "wildlife surveys for the entire proposed corridor should reflect current conditions with surveys ***no older than three years***." Ex. I (emphasis added).

149. On February 28, 2008, the CORPS notified Pasco County that the EPA and FWS recommended denial of the application to permit the Ridge Road Extension due to adverse effects on the Serenova Preserve, and the CORPS concurred. Ex. J.

150. In the February 28, 2008 letter, the section, "Minimization of Wetland Impacts," advised that the project still showed a 250' right of way on the Serenova Preserve and a 70-mph design speed, whereas the Preserve is part of a "large wildlife corridor hence rendering it for special consideration including reducing the ROW to 132'." *Id.* at p. 3.

151. On May 14, 2008, the CORPS held a meeting with Pasco County to discuss the February 28, 2008 correspondence, and advised that if the applicant chose to "withdraw the permit application and resubmit a totally new package at a later date, "***all the data would be current and all old data would be discarded.***" Ex. K (emphasis added).

152.  On May 31, 2011, Pasco County and FDOT, through its Florida Turnpike Enterprise ("FTE"), re-submitted a joint application for the Ridge Road Extension.

153.  On June 8, 2011, the CORPS corresponded with the FWS and EPA regarding the May 31, 2011 application for the proposed RRE Project and also submitted to the agencies all prior agency correspondence, applicant submittals, formal CORPS correspondence to the applicant, and all previous CORPS correspondence to FWS and EPA. Ex. L.

154.  Noticeably absent for the submittal was all prior public comments on the prior applications and submissions, thereby effectively eviscerating the public participation from documentation that the agencies would eventually review and rely upon in their decisions.

155.  On November 28, 2011, the CORPS published a Public Notice for the Ridge Road Extension based on the resubmitted application. Ex. M.

156.  Plaintiff DAN RAMETTA was informed by the CORPS that prior comments and requests for public hearing would be incorporated into the administrative record.

157.  Plaintiffs SIERRA CLUB and DAN RAMETTA submitted public comments and requests for public hearing in response to the CORPS' 2011 Public Notice, and relying upon the CORPS' representation did not re-submit prior public comments that were already be in the administrative record.

158.  The 2011 Public Notice evidenced that the Ridge Road Extension still contains significant and material data and designs from the 2000 project proposal, despite the directive for old data to be discarded, *id.* at pp. 2 ("The alignment of the proposed roadway remains unchanged from that featured in the 2000 public notice."), 4 (The 2000 public notice featured the following avoidance and minimization measures which are still featured in the project design…"), 5 (The preferred alignment

of the proposed roadway remains unchanged from that advertised in the 2000 public notice."),

prompting an inquiry into the CORPS' present approval despite the concerns raised in the February

28, 2008, CORPS' correspondence to the applicant.

159. On January 27, 2012, the EPA again determined that the proposed project did not comply with

its guidelines and may have substantial and unacceptable adverse impact on the Aquatic Resources

of National Importance ("ARNI") within the project area. Ex. N at p. 4.

160. On February 6, 2014, the CORPS advised the applicants that submissions thus far did not fully

address the alternatives recommended by the CORPS. *Id.* at p. 5.

161. On April 15, 2015, Pasco County and FDOT submitted an Alternatives Analysis.

162. On March 13, 2018, FDOT submitted a draft mitigation plan to the CORPS, requesting that

compensatory mitigation previously completed for construction of the Suncoast Parkway be

determined excess and apply to mitigation for the Ridge Road Extension. Ex. N at p. 6.

163. On August 14, 2018, Pasco County advised the CORPS that Phase II would be changed from

limited access to an arterial roadway with as many as seven (7) signalized intersections. *Id.*

164. On September 25, 2018, the CORPS issued a Public Notice for Comments regarding SAJ-

2011-00551 (SP-TSH), advising that the project would:

    (a) affect waters of the United States associated with the Pithlachascotee River, Anclote

        River, and Fivemile Creek;

    (b) commence at the intersection of Ridge Road and Decubellis / Moon Lake Road

        (County Road 587) and end at the intersection of Land O'Lakes Boulevard (U.S.

        Highway 41) and Connerton Boulevard in Pasco County, Florida; and

(c) the western portion of the proposed project would traverse the Serenova Tract of the Starkey Wilderness Preserve.

Ex. O at p 1.

165. The purpose of the Ridge Road Extension was advertised to:

(a) improve east-west roadway capacity and enhance overall mobility within the area bound by SR-52 to the north, SR-54 to the south, US-41 to the east, and Moon Lake Road, DeCubellis Road, Starkey Boulevard to the west; and

(b) provide additional roadway capacity and improved routing away from coastal hazard areas and improve evacuation times in the event of a hurricane, or other major weather-related occurrence, in accordance with State of Florida requirements and the County's current Comprehensive Plan.

*Id.* at p 2.

166. The proposed work is described as:

(a) three segments that include Phase I, an interchange with the Suncoast Parkway, and Phase II;

(b) Phase I would be located west of the Suncoast Parkway interchange and would consist of a 4-lane divided roadway that is approximately 4.2 miles in length;

(c) the proposed roadway would intersect the Suncoast Parkway approximately 3.2 miles south of SR-52 at an existing overpass, a full diamond interchange and approximately 1 mile of 4-lane divided roadway would be constructed within the limits of the interchange;

(d) Phase II would be located east of the Suncoast Parkway interchange and would
consist of 4-lane divided roadway that is 3.44 miles in length;

(e) design of Phase II would be as an arterial roadway that would allow as many as
seven (7) signalized intersections (also referred to as "full movement intersections")
between the Suncoast Parkway and Land O'Lakes Boulevard (US-41).

*Id.* at pp. 2-3.

167. In response to the 2018 Public Notice, Plaintiffs, SIERRA CLUB and DAN RAMETTA, submitted additional public comments and requests for public hearing and did not re-submit prior public comments that were already be in the administrative record.

168. Public comment dated April 8, 2019 and authored by Plaintiff DAN RAMETTA was submitted to the CORPS advising of Pasco County's 2018 approval of a 2,900-acre MPUD, Lennar's titled "Project Arthur," to be located east of the Suncoast Parkway. Ex. P.

169. In June of 2019, Pasco County submitted its Ridge Road Extension – Cumulative Impacts Analysis.

170. The June of 2019 Cumulative Impacts Analysis for Ridge Road Extension has a number of defects that resulted in an arbitrary and capricious issuance of the RRE Permit, to wit:

(a) fails to take into account cumulative impacts from future widening of the roadway
from four to six-lanes on Phase I through the Serenova Preserve, despite specific
knowledge of this proposal, Ex. Q at p.1;

(b) fails to take into account traffic increase and associated impacts, such as noise, air
quality, and roadway mortality of threatened and endangered species, with
connection to Suncoast Parkway interchange, and the Suncoast Parkway II, as well as

the 2,900-acre Project Arthur MPUD, which is a reasonably foreseeable project;

(c) limits the "Focus Area" to those areas that will be developed and fails to analyze impacts to conservation lands, whether privately or publicly owned, as Pasco County claims that these areas are unlikely to be developed, *id*. at p. 5;

(d) limits direct impacts to construction of the roadway and assumes indirect impacts to only extend 300 feet from the roadway, *id.* at p. 10;

(e) fails to fully analyze cumulative impacts to the Anclote and Pithlachascotee Basins, recognizing that "[o]ther changes could occur that would not be reflected in the trends shown" although these potential cumulative impacts could "change wetland functional values" and will most likely occur sooner with construction of the Ridge Road Extension, *id.* at p. 11;

(f) admits that there has been "***limited data collected for parameters related to roadway runoff impacts (i.e. oil and grease, metals, and lead,)***" despite the reasonable foreseeability of an increase in roadway runoff impacts into wetlands and the Serenova Tract of the Starkey Wilderness Preserve, *id.* at p. 14 (emphasis added);

(g) makes the unsubstantiated statement that "[c]urrent water quality impacts due to materials that would result directly from runoff from roadways appears to be minimal or non-existent," despite the admission that limited data existed to support such a finding, *id.* at p. 19;

(h) relies upon conservation lands situated on both sides of the Pithlachascotee River and its tributaries, including the Serenova Tract, to "reduce any cumulative changes in water quality that might otherwise occur [from increase in intensity of development

in areas that are not currently accessible from existing roadways] by capturing, retaining, and sometimes altering materials that would otherwise wash downstream," *id.*, essentially claiming that the quality of the conservation lands will be impacted by discharges related to increased development in contradiction to the previous assessment that conservation lands would not be impacted;

(i)  recognizes the Ridge Road Extension has the "potential to contribute cumulative impacts on wildlife habitat and the wildlife species supported by that habitat," and focuses the cumulative impact analysis solely on the changes in land use on wildlife habitat due to the "individual species listed as endangered, threatened, or of special concern by wildlife agencies were covered in the Biological Assessment … and not repeated here," *id.* at p. 25, however, the Biological Assessment relied upon surveys of wildlife conducted in 2013 and does not provide any analysis on the current state of these species within the affected areas, including the Serenova Tract of the Starkey Wilderness Preserve, despite the FWS' direct guidance on this issue, Ex. I;

(j)  fails to analyze cumulative impacts to federally listed wildlife, such as the wood stork, Florida Scrub Jay, Eastern Indigo Snake, Red-Cockaded Woodpecker, and threatened gopher tortoise, as those species were "addressed" in the Biological Assessment, Ex. Q p. 25, despite the reliance on surveys conducted in 2013;

(k)  admits that due to "**lack of site data for most wildlife species known to occur on privately owned lands** in the Area of Analysis, [applicants] **rely on extrapolation from wildlife studies** conducted for the potential extension of Ridge Road **on public land ownerships** as well as general data for western peninsular Florida for much of

the historical data," *id.* (emphasis added)*,* indicating that not all of the wildlife habitats that will be impacted were professionally surveyed;

(l)  admits to reliance upon 2013 wildlife surveys conducted for the RRE Project to determine "current conditions," *id.*, and concludes that many listed species no longer reside within the Starkey Wilderness Preserve based upon the 2013 data, *id.* at p. 29;

(m) admits that, to the applicant's knowledge, "***no site-specific studies of wetland-dependent wildlife has been conducted,*** but based on the types of wetlands present, [applicant] would anticipate that they would be used by amphibians, reptiles, small fish, and insects," *id.* at p. 30, indicating that the cumulative impact analysis to conduct a ***non-water dependent project over wetlands*** did not even study ***wetland-dependent wildlife***; and

(n)  overall concludes that the assessment, and the BiOp, demonstrate that "most rare species that require large ranges are gone from the area now…species that are currently present are those that can tolerate isolation from other large blocks of habitat," *id.* at p. 31. However, the outdated data from 2013 does not support a conclusion on the current state of the wildlife and habitats that will be affected by cumulative impacts associated with the Ridge Road Extension.

171.  On July 24, 2019, the SWFWMD issued a major modification to the Environmental Resource Permit ("ERP") granted to Pasco County, and states that the stormwater management design for Phase I of the Ridge Road Extension "was based on an ***ultimate 6-lane divided typical section. Initial construction for Phase I is planned for a 4 lane divided typical section with widening into the median in the future.***" Ex. R at p. 4 (emphasis added).

172.  The original application and granted ERP included the provisions for an ultimate 6-lane section and future widening in Phase I, despite the conservation easement that grants permission for a 4-lane roadway with minimum right of way width of 250 feet.

173.  In July of 2019, Pasco County submitted its Alternative Analysis for Ridge Road Extension, and in September of 2019, Pasco County submitted an Addendum.

174.  The September of 2019 Addendum to the Alternative Analysis for Ridge Road Extension has a number of defects that resulted in an arbitrary and capricious decision to issue the RRE Permit. The addendum is defective in that it,

(a) admits that the inclusion of additional intersections are "reasonably foreseeable in the future" but claims that due to uncertainty in the timeframe, number, or locations, the wetland impacts associated with these future intersections have only been accounted for as "indirect" impacts for all of the alternatives, Ex. S at p. 6;

(b) admits that the number of acres of ***direct*** wetland impact and ***indirect*** wetland impacts were limited to within a 300' area on both sides of the alignments, *id.*;

(c) considers future widening of roadways or construction of new intersecting roadways as reasonably foreseeable future impacts, but only considered indirect and quantified based on an area of 300' on each side of the direct impact area; *id.* at p. 9;

(d) references the Modified Alternative 7A, which was the chosen route, as an extension of Ridge Road as a "4-lane roadway west of Suncoast Parkway with segments of the roadway on bridges through all but 1.8 acres of wetlands and most upland portions of the Serenova Preserve," *id.* at p. 24, despite the ultimate widening of the Ridge Road Extension permitted by SWFWMD to six (6) lanes in Phase I through the Serenova

Preserve that would violate the conservation easement requirement for four lanes;

(e) admits in the cumulative impacts analysis for Modified Alternative 7A that the functional classification as an arterial roadway on Phase II east of the Suncoast Parkway will "allow for future at grade roadway connections and signalized intersections between the Suncoast Parkway interchange and US 41," recognizes that "up to seven (7) full access signalized intersections may be permitted," and admits that these intersections are "reasonably foreseeable in the future," but again claims uncertainty to timeframe, number, and locations, and therefore does not specify any cumulative impact analysis performed; *id., see also,* p. 47 (quantifying any impacts as "indirect" despite the recognition that "potential for wetland impacts associate with the long embankment slopes to achieve grade separation at the roadway crossing location are potentially substantial");

(f) advises that the reclassification from an "uninterrupted flow limited access facility to an inherently less-safe interrupted-flow arterial road introduces the possibility of additional crashes," *id.* at p. 25, but still fails to address impacts from increased traffic and associated impacts, such as noise, air quality, and roadway mortality of threatened and endangered species, due to the connection with the Suncoast Parkway and Suncoast Parkway II;

(g) admits that the cost to Pasco County for Alternative 10, which would be a 4-Lane expansion on Tower Road and have considerably less impacts to wetlands, streams, and direct habitat in natural uplands than the chosen route, *id.* at p. 50, is approximately $21,177,000 less than the cost of the Alternative Mod 7A with

improved mobility and reduction of congestion level compared to the No Action Alternative, *id.* at p. 32;

(h) claims that while Alternative 10 is within Pasco County's ability to fund, it provides "minimal improvement to mobility and/or excavation times such ***that this outcome is not worth the cost of the Alternative to the applicant at any price***," *id.* at p. 44 (emphasis added), indicating that the applicant dismissed the consideration of this abundantly less environmentally damaging alternative without considering the reduction in environmental impacts, *see* Ex.V, despite also recognizing the "impacts to wetlands as special aquatic sites under Section 404(b)(1) Guidelines are ***an important consideration in the alternatives analysis***," and that the "[w]etlands located within the Serenova Preserve ***clearly have generally high functions and services and therefore ecological value because they are located within and serve as an integral part of a protected area with generally natural overall ecosystem functions and structure***;" *id.* at p. 46 (emphasis added).

175. On September 20, 2019, the FWS issued its Biological Opinion, relying upon its Biological Assessment of 2016 based solely on outdated surveys of wildlife from 2013. Ex. N.

176. The reliance on stale surveys from 2013, nearly seven (7) years old, is directly contrary to FWS' own guidance to the CORPS that surveys for the Ridge Road Extension project "should reflect current conditions with surveys ***no older than three years***." Ex. I (emphasis added).

177. The September 20, 2019 BiOp has a number of defects that resulted in an arbitrary and capricious issuance of the RRE Permit:

(a) describes the Ridge Road Project as a "4-lane divided roadway and interchange system;" Ex. N at p. 7, *see also* p. 8, and fails to address any impacts to wildlife and their habitat that are reasonably foreseeable to occur with the "ultimate 6-lane" permitted for from the SWFWMD;

(b) admits that information in the BiOp relies upon information provided in the Biological Assessment, *id.* at p. 8, despite the surveys utilized from 2013;

(c) advises that the "County and FTE described that indigo snakes ***could be impacted as a result of developments of the properties east of the Suncoast Parkway that may request access to the [Ridge Road] Extension,*** although access to all other properties that may be developed in the future could be obtained via existing roadways. ***There are no proposed developments at this time***," *id.* at p. 11 (emphasis added); despite being put on notice of the approved development Project Arthur by public comments from Plaintiff DAN RAMETTA, *id.* at x 1 p. 38, indicating a failure to review and consider public comments;

(d) admits that "[a]dditional research is needed to gain a better understanding of the natural history of the eastern indigo snake and its habitat for use in developing and implementing management plan," and "[e]astern indigos are often difficult to detect during surveys based on the biology of the species and its cryptic nature," *id.* at p. 16, yet despite this, the BiOp does not reference any new studies that have taken place or are intended to take place to accurately analyze impacts and potential takings;

(e) advises that "impacts to indigo snacks ***could occur as a result of development of the properties east of the Suncoast Parkway that may request access to the [Ridge***

41

***Road] Extension…There are no proposed developments at this time and the Service does not have any information to analyze the effects of these future actions on the indigo snake in the Action Area,*** *id.* at p. 21 (emphasis added), despite being put on notice of the approved development Project Arthur by public comments from Plaintiff DAN RAMETTA, Ex. U at p. 38, indicating a failure to review and consider public comments or being provided appropriate information from the applicant to fully analyze the direct, indirect, and cumulative impacts to listed species;

(f) describes the Action Area as being "located ***within over 19,000 acres of potentially suitable indigo snake habitat in the Starkey Wilderness Preserve*** west of the Suncoast Parkway and ***over 13,000 acres of private lands*** supporting agricultural and silvicultural activities east of the Parkway," *id.* (emphasis added), whereas other decisional documents have admitted that surveys were not conducted upon private lands and instead extrapolation was utilized, Ex. P at p. 25, thus  indicating a clear lack of sufficiency in determining the number of eastern indigo snakes on private land for an accurate analyses of impacts and potential takings;

(g) admits that "[l]ittle is known about the eastern indigo snake in the Action Area or the immediate vicinity," Ex. N at p. 17, and references surveys conducted in September of 2012, and between December 3, 2012 and March 19, 2013, that do not accurately reflect the current number of eastern indigo snakes in the Action Area for an accurate analysis of impacts and potential takings;

(h) admits that "habitat destruction and fragmentation will further contribute to threats to the species and roads are a significant source of mortality for the species," *id.*;

(i) admits "it is reasonable to determine that the backfill of gopher tortoise burrows within the project site will result in the take of eastern indigos which may be utilizing gopher tortoise burrows within the Action Area. During burrow excavation, eastern indigos may also be unintentionally entombed inside tunnels…harmed by direct strikes from equipment when excavating burrows…If eastern indigos are not directly impacted through harm or harassment during burrow excavation, snakes may be impacted later…return to their overwintering site and are forced to find different refugia in a short time during cold conditions…Should eastern indigos be forced to find new winter refugia, this would result in a significant change to natural breeding and sheltering behavior…Land clearing will result in a permanent change of approximately 71.8 acres of ideal eastern indigo habitat. Changes to this landscape will result in eastern indigo snakes being injured or killed through habitat modification;" *id*. at p. 19, facts that do not support the ultimate conclusion that the proposed Ridge Road Extension "is not likely to jeopardize the continued existence of the eastern indigo snake," *id.* at p. 22;

(j) advises that the FWS did not analyze the effects of development of the properties east of the Suncoast Parkway due to not having any information to assist with the analysis, *id.* at p. 21, despite the reasonable foreseeability of such projects and the further admission that "[f]uture development around the Starkey Wilderness Area will result in limiting the amount of habitat that is available for the eastern indigo snakes and their movement or dispersal from the Starkey Wilderness Area to other suitable areas. Within the Action Area will be an increase in buildings, roads, and

associated infrastructure, all of which have the potential to have indirect adverse effects on indigo snakes (***e.g., increasing road mortality, decreasing habitat quality, increased predation and competition from more urban adapted wildlife etc.***)," yet claims that the cumulative effects "are difficult to quantify because we cannot predict where or when they might occur and we cannot specifically attribute adverse impacts to any one particular project…***these factors will probably work synergistically against indigo snakes and we expect that these negative impacts will significantly reduce the number of indigo snakes in the area***, *id.* at p 22;

(k) ultimately, rather than issue an incidental take permit the FWS requested the applicants to use reasonable and prudent measures to minimize the impact of incidental take and required monitoring and reporting; *id*. at pp. 25-26;

(l) finally, the BiOp is completely devoid of any discussions of the federally threatened wood stork, which was confirmed to be located in the Action Area in the April 2016 Biological Assessment, the threatened Florida Scrub Jay, which despite not being sighted in the 2013 surveys, have been known to reside at the Starkey Wildlife Preserve and in the absence of current data could potentially be impacted, or the threatened Gopher Tortoise, which is well documented to reside and rely upon habitat within the parameters of the proposed Ridge Road Extension.

178. On December 20, 2019, COLONEL ANDREW KELLY, Commander and District Engineer of the U.S. Army Corps of Engineers, Jacksonville District, approved the CORPS' Environmental Assessment, Public Interest Review, and Statement of Findings for the Ridge Road Extension application.

179. The EA relied upon FWS' BiOp and documentation submitted by the applicants.

180. The EA has a number of defects that resulted in an arbitrary and capricious issuance of the RRE

Permit:

(a) describes the project as "4-lane" divided roadway, Ex. T at p. 3, despite RRE
Permit's inclusion of the July 24, 2019, SWFWMD's ERP describing an ultimate 6-
lanes and widening of the roadway constructed in Phase I that would violate the
conservation easement requirement for four lanes;

(b) recognizes the Ridge Road Extension as an arterial roadway that would allow as
many as seven (7) signalized intersections but does not include an impact analyses
due to the location not being determined or constructed under the project; *id*. at p. 8,
despite the reasonably foreseeability of the intersections;

(c) references numerous comments received during the review of the 2000 proposed
project, *id*. at p. 12 yet fails to include any of those comments in the record of
decision nor address in the EA, *see id.* at p. 155 ("Comments submitted in response
to the Corps' 2000 public notice are not considered in this evaluation"), despite
references in the 2011 Public Notice declaring that many factors from the 2000
Public Notice had not changed, Ex. M;

(d) advises that the proposed compensatory mitigation includes Pasco County
purchasing mitigation bank credits from Old Florida Mitigation Bank and the
CORPS approving FDOT's Turnpike Enterprise to use excess mitigation credits from
the Suncoast Parkway in combination with a purchase of mitigation bank credits
from Old Florida Mitigation Bank, Ex. T at p. 19, such mitigation measures are

insufficient as they do not restore the impacts to the Serenova Tract, that was set aside for mitigation and conservation for the impacts associated with the Suncoast Parkway, and are based upon incomplete information that does not fully analyze the direct, indirect, and cumulative impacts of the RRE Project;

(e) advises that the indirect impacts to wetlands were quantified within 300 feet from the proposed Ridge Road Extension limited; *id.* at p. 47; and the extent of the cumulative Federal control and responsibility "is sufficient to include within the NEPA scope of analysis the upland areas in the immediate vicinity of the waters of the U.S. where the regulated activity would occur and those areas within 300 feet of the limits of construction," *id.* at p. 48, thereby precluding any analysis of impacts father than 300 feet of the roadway and severely curtail the limits of NEPA;

(f) admits that despite a ***public meeting/hearing being requested***, one ***was not held***, and giving the inadequate rationale that "[u]pon a thorough review of the submitted comments, the Corps found that the ***substantial issues raised have been considered by the Corps in its evaluation of the application.*** All relevant information is being addressed in this document and will be posted on the Corps' website. Additional relevant information has also been made available on Pasco County's website," *id.* (emphasis added); this rational is not in conformity with NEPA;

(g) references public comments received in Attachment 1 to the EA, Ex. U, but fails to include any comments from prior to 2011 despite assurances to DAN RAMETTA that prior comments would be included, resulting in duplicative comments not being submitted;

(h) discusses the agreements between Pasco County, FDOT, and the SWFWMD regarding mitigation of the Suncoast Parkway, the Serenova Preserve, and the Ridge Road Extension as if the set aside was specifically granted for the project, *id*. at pp. 51-56, yet wholly fails to identify the agreements specifying that the set aside for the Ridge Road Extension is for an "ultimate four-lane" roadway with minimum right of way of 250 feet, Ex. B at §4, and conditioned upon the applicant obtaining "permission" of the CORPS FWS, EPA, SWFWMD, and Florida Fish and Wildlife Conservation Commission, Ex. C at § 5, as well as failing to identify if the requisite permission was granted to the applicant;

(i) advises that in 2012 the EPA first recommended denial of the project for not complying with the EPA Guidelines and the potential to have substantial and unacceptable adverse impacts on an ARNI, Ex. T at p. 60;

(j) advises that in 2012 the EPA identified a need for "(1) an updated jurisdictional determination, (2) an appropriate alternatives analysis to enable the Corps to determine the [LEDPA],  and (3) traffic modeling for different alternative roadway alignments and widenings that would aid in the analysis for the LEDPA determination," *id.* at p. 63,

(k) advises that in 2012 the EPA found that "the applicant did not follow the 2008 Mitigation Rule for avoidance, minimization, and compensatory mitigation for the proposed project described by the 2011 public notice," *id.* at p. 72,

(l)  advises that in 2018 the EPA reviewed information, including the public notice of September 28, 2018, and therefore "no longer believe[d] the project would have a

substantial and unacceptable impact on ARNI," *id*. at p. 63, however there is no discussion on the specific information reviewed and as the documentation is based upon outdated surveys to determine impacts on wildlife and wetlands there may have been insufficient data provided to the EPA to make an appropriate determination;

(m) advises that the CORPS "solicits comments and considers the views of state and federal resource agencies, such as the USEPA, as well as the public, *id.* at p 61, *see also* p. 68 (advising that the CORPS coordinated all comments from the public), yet fails to include any public comments prior to 2011 in the decisional documents despite the fact that some designs were not modified in 2011 (*see id.* at p. 61 "Design changes were undertaken *prior to the 2011 permit application*…" (emphasis added));

(n) advises that in a letter dated December 13, 2019, the FWS stated, "the Corps has provided the Service with ***an extensive biological assessment*** …" *id*. at p. 65, however the Biological Assessment referenced was drafted for Pasco County and relied upon outdated and inadequate surveys from 2013, *id.* at pp. 95, 100, to identify impacts to wildlife and their habitat, including wetlands of the Serenova Tract of the Starkey Wildlife Preserve;

(o) advises that the CORPS evaluated "short-term and the long-term effects of the proposed project," *id*. at p. 66, yet failed to address impacts from future and reasonably foreseeable developments, projects, and future widening of Phase I to six (6) lanes that would undoubtedly increase traffic and associated environmental impacts such as noise, air quality, and roadway mortality of threatened and endangered species;

(p) references the "Arthur Project" throughout, which is a development project *east of the Suncoast Parkway and known to the applicants* and of which a *permit has already been received by the CORPS for the first phase of the residential development*, and identifies other known projects, such as the Project Excalibur and the permitted Bexley Ranch; *id.* at pp. 57, 83-85, 96, 125, 138-140, 145, 232 (recognizes State ERP permits for Project Arthur and Excalibur, and the CORPS' permit for Bexley Ranch), 237-238, 241 (describing the "large scale master-planned unit development covering approximately 6,800 acres), 246, yet despite these admissions of the CORPS' knowledge of proposed developments, the CORPS failed to require re-initiation of the FWS' listed species evaluation, resulting in a failed NEPA analysis and inadequate mitigation;

(q) advises that the CORPS evaluated "permanent and temporary direct impact from the proposed discharges of fill material into aquatic resources and the compensatory mitigation proposed…as well as the indirect effect and the cumulative effects," *id.* at p. 66, yet failed to extend the impact analysis past 300 feet from construction;

(r) advises that the CORPS evaluated "probable impact which the proposed activity may have on the public interest," *id.*, yet failed to hold a public hearing despite multiple requests and clear "opposition from a share of the public, including many non-governmental organizations such as Citizens for Sanity [] and Sierra Club," *id*. at pp. 67-68;

(s) advises that the CORPS evaluated "compliance with the 404(b)(1) Guidelines," as well as completing consultation pursuant to the ESA for impacts to threatened and

endangered species, *id.* at p. 66, yet failed to do an independent analysis when informed that surveys relied upon were nearly seven (7) years outdated,

(t) advises that, despite the above, the CORPS "***determined the impacts of the RRE are less than significant and therefore do not rise to a level with the need to prepare an EIS…*"** *id.* (emphasis added), in contradiction to the principles of NEPA as a hard look at the associated direct, indirect, and cumulative impacts did not take place;

(u)  advises that the applicant admits, "it may be possible that the Serenova Tract within the Starkey Preserve would be considered a state established sanctuary or refuge ***although it was established principally as mitigation for the Suncoast Parkway project***," and states that since the conservation easement did not "preclude" the Ridge Road Extension project," ***any effect on the Serenova Tract associated with the discharge of fill material from Ridge Road cannot be considered a possible loss of value of the tract as it had been considered when it was originally established and the impacts were expected to be offset by mitigation outside the tract***," *id.* at p. 78, although this is not the premise of NEPA or the ESA to ignore impacts to wildlife and their habitats, especially wetlands;

(v) advises that the CORPS understood and recognized, "***All alternatives considered would include impacts to special aquatic sites***," yet did not require that any other alternatives be thoroughly analyzed by in the EA, or in an EIS, that would not impact special aquatic sites, despite Pasco County's admission, "***Other alternatives may exists (as suggested in the comment) but the applicant was not requested to include them in the alternatives analysis and does not believe they would be determined***

50

*practicable.*" *Id*. at p. 87, this is directly contrary to Guidance on the CWA that strictly prohibit the CORPS from issuing any permit "if there is a practicable alternative . . . which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a);

(w) admits that reasonably foreseeable projects and developments could have a potential for substantial "wetland impacts associated with the long embankment slopes to achieve grade separation at the roadway crossing location," and that the construction of the Ridge Road Extension will increase access to large undeveloped tract of land and likely increase the rate of development, but still assesses such impacts as "indirect" within 300 feet from the project site,  Ex. T at p. 83;

(x) advises that the proposed project is broken into three parts, Phase I – which will be constructed through the Serenova Tract of the Starkey Wildlife Preserve; the Suncoast Parkway Interchange – which is being constructed by FDOT; and Phase II – of which the Right of Way has not yet been acquired, *id*. at pp. 124-25, and describes each of the proposed mitigation measures for the three parts: Phase I and II will be mitigated by purchasing credits at Old Florida Mitigation Bank, and the mitigation for the Suncoast Parkway Interchange will utilize *excess mitigation credits that remain from the construction of the Suncoast Parkway* and credits purchased from the Old Florida Mitigation Bank, a proposed mitigation that "*does deviate from the preferred hierarchy,*" *id.* at pp. 226-27; despite this admission, the mitigation was approved yet the cumulative impact analysis does not take into consideration any traffic increase or associated impacts, such as noise, air quality,

and roadway mortality of threatened and endangered species, in connection with the Suncoast Parkway or its feeder roadway the Suncoast Parkway II;

(y) admits that "much of the focus area" was "un-surveyed," and relied upon the "assum[ption] [of] similar findings with addition surveys," *id.* at p. 246, indicating that a number of the wetlands and property held in private ownership were not physically visited by surveyors on the ground thereby resulting in inadequate information to properly analysis the direct, indirect, and cumulative impacts of the project;

(z) advises that the most recent survey for the presence of any resident scrub-jay families was done in 2013, *id.* at 250, and concluded that "[i]n the absence of other ***current, site-specific data indicating the presence of scrub-jay within the Action Area, and the lack of reasonably foreseeable cumulative effects, the Corps determination is that the RRE will have "No Effect" on scrub-jay***," *id.* at p. 251 (emphasis added), such a conclusive statement wholly fails to acknowledge the FWS' own guidance that surveys for the entire proposed corridor should reflect current conditions "***with surveys no older than three years***," Ex. I (emphasis added);

(aa) similarly, the EA recognizes that suitable foraging and nesting habitat occurs along the Ridge Road Extension for the Red-Cockaded Woodpecker ("RCW"), Ex. S at p. 251, but again concludes "[i]n the absence of other ***current, site-specific data indicating the presence of RCWs within the Action Area, and the lack of reasonably foreseeable cumulative effects, the Corps determination is that the RRE will have "No Effect" on RCW***," *id.* at p. 252 (emphasis added), such a conclusive

52

statement wholly fails to acknowledge the FWS' own guidance That surveys for the entire proposed corridor should reflect current conditions "***with surveys no older than three years***," Ex. I (emphasis added);

(bb)    acknowledges that the proposed project which is in the Core Foraging Area and supports Suitable Foraging Habitat for wood stork, "may affect, but is not likely to adversely affect" wood stork, Ex. T at p. 252, required mitigation credits to be purchased and <u>despite the clear lack of analysis of impacts in the BiOp</u>, determined that "no further consultation is required for wood stork, *id*. at pp 253-54;

(cc)    admits that gopher tortoises have been "documented within and adjacent to the project alignment during all previous wildlife surveys," advises that connectivity of areas outside, but contiguous to, the Action Area will likely come at the expense of roadway mortality, *id*. at p. 255, and concludes that if a successful relocation program is implemented, then the project "May Affect, Not Likely to Adversely Affect" the species, although the FWS did not provide any concurrence or mention the Gopher Tortoise in its final BiOp the CORPS "***assumed***" concurrence rather than requesting additional consultation, *id.* at 257;

(dd)    finally, the CORPS' EA concludes that despite proposed impacts to wetlands, "the beneficial effects of the project outweigh the detrimental impacts of the project," *id*. at p. 262, however, the CORPS EA is deficient and failed to conduct an EIS, as demonstrated thorough a lack of NEPA analysis and proper data to fully and adequately assess the direct, indirect, and cumulative impacts of the Ridge Road Extension project on the wildlife and wetlands within the project area.

181. The CORPS' EA is arbitrary and capricious in violation of the APA.

182. Specifically, the CORPS failed to (1) independently require that proper data be used to analyze impacts on wildlife and their habitat despite clear guidance that all wildlife surveys for the entire proposed corridor should reflect current conditions with surveys no older than three years old, (2) properly consider the direct, indirect, and cumulative effects of reasonably foreseeable development and projects, including traffic increases and associated environmental impacts, such as noise, air quality, and roadway mortality of threatened and endangered species, resulting from the connection with the Suncoast Parkway Interchange and the Suncoast Parkway II, and future widening of Phase I to an ultimate six (6) lane roadway, (3) properly consider the direct, indirect, and cumulative effects on wetlands beyond 300 feet from construction and (4) require analysis of alternatives that do not impact special aquatic sites, i.e. wetlands.

183. CORPS failure to take a hard look at all of the direct, indirect, and cumulative impacts from the proposed Ridge Road Extension is a violation of NEPA.

184. On December 20, 2019, CORPS issued the subject permit for the Ridge Road Extension pursuant to Section 404 of the CWA (33 U.S.C. 1344). Ex. A.

185. The RRE Permit included as attachments the SWFWMD permit, which references future widening and ultimate 6-lanes for Phase I, and the Biological Opinion, which relies upon surveys from 2013.

186. The RRE Permit was issued without a public hearing or preparation of an adequate EA, BiOp, or any other analysis. These actions violate NEPA and the APA.

## COUNT I

**Violations of the National Environmental Policy Act and Administrative Procedures Act**

Plaintiffs re-allege and incorporate by allegations set forth in paragraphs 1-186, and all subparts, as though fully set forth below.

187. This claim is brought against all Defendants and is raised by all Plaintiffs.

188. The CORPS performed a major federal action for the purpose of NEPA by issuing Clean Water Act Permit No: SAJ-2011-00551 (SP-TSH). *See* 42 U.S.C. § 4332(2)(C).

189. This action was a final agency action under the APA, 5 U.S.C. § 704.

190. The CORPS has violated NEPA and the CEQ's implementing regulations, abused its discretion, and acted arbitrarily and capriciously in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) by failing to prepare a NEPA document that adequately addresses the serious environmental issues raised by the CORPS' decisions to issue the RRE Permit, including by:

  (a)   failing to take a hard look at the significant direct, indirect, and cumulative environmental effects of its actions in permitting the Ridge Road Extension, including by failing to meaningfully assess the environmental impacts of its action as it relates to other reasonably foreseeable projects and developments, such as future widening to six lanes, and the traffic increases and associated impacts, such as noise, air quality, and roadway mortality of threatened and endangered species, related to the Suncoast Parkway and Suncoast Parkway II;

  (b)   failing to require current critical environmental information and analysis to adequately assess the direct, indirect, and cumulative impacts of the Ridge Road Extension on wildlife and the wetlands;

  (c)   failing to analyze and discuss less environmentally damaging alternatives;

  (d)   approving an alternative that will bisect the Serenova Preserve and failing to properly evaluate the detrimental effects of such an action;

  (e)   failing to encourage and facilitate public involvement in these decisions, which are of substantial environmental controversy, including, but not limited to, by failing to include public comments from prior to the 2011 reapplication in the Record of

55

Decision, failing to adequately respond to requests that the agency hold or sponsor public hearings, as requested by several interested parties—including Plaintiffs, and failing to hold or sponsor such hearings without proper justification;

(f)     improperly narrowing the analysis performed in the EA to impacts within 300 feet of the construction of the Ridge Road Extension;

(g)     failing to supplement its NEPA review with significant new information relevant to environmental concerns and bearing on the action and its impacts as it relates to the federally threatened species in the Starkey Wilderness Preserve; and

(h)     otherwise disregarding the requirements of NEPA and the CEQ regulations.

191.  As a result of these errors, the CORPS failed to promote efforts that will prevent or eliminate damage to the environment; failed to use all practicable means to foster and promote the general welfare; and failed to create and maintain conditions under which humans and nature can exist in productive harmony.

192.  As described above, the NEPA and CWA reviews conducted by the CORPS in connection with its decision to issue the RRE Permit is inadequate and flawed, and the CORPS' reliance on it was and is arbitrary and capricious, an abuse of discretion, and otherwise in violation of the Administrative Procedures Act.

193.  These violations have caused and will continue to cause Plaintiffs' injuries as described herein.

## COUNT II

### Violations of the Clean Water Act and Administrative Procedures Act

Plaintiffs re-allege and incorporate by allegations set forth in paragraphs 1-186, and all subparts, as though fully set forth below.

194.  This claim is brought against all Defendants and is raised by all Plaintiffs.

195.  The CORPS violated its mandatory duty under the CWA, the 404 Guidelines, the EPA's binding guidelines, and LEDPA regulations, and consequently abused its discretion, and acted

56

arbitrarily and capriciously in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) in

deciding to issue Permit No: SAJ-2011-00551 (SP-TSH) for the Ridge Road Extension by:

(a)    failing to hold a public hearing;

(b)    failing to adequately consider the significant effects upon wildlife and their habitat, including wetlands;

(c)    failing to adequately develop a full range of alternatives, including design modifications, and studying those alternatives under its regulations, including alternatives that do not impact special aquatic sites;

(d)    failing to minimize and eliminate all avoidable environmental impacts associated with the LEPDA, including the filing of waters of the United States and direct, indirect, and cumulative impacts to habitat for endangered, threatened, and rare species;

(e)    failing to adopt a LEPDA that will not result in unnecessary and avoidable environmental impacts to the Starsky Wildlife Preserve, and the Serenova Tract;

(f)    failing to rebut the presumption set forth in in 40 C.F.R. § 230.10(a)(3) that practicable alternatives that do not involve wetlands are available; and

(g)    failing to independently verify the veracity of the claims, studies, and/or reports of the applicant regarding feasibility of alternatives.

196.  The CWA review conducted by the CORPS in connection with its decision to issue the RRE

Permit is inadequate and flawed, and the CORPS' reliance on it was and is arbitrary and capricious,

an abuse of discretion, and otherwise in violation of the Administrative Procedures Act.

197.  These violations have caused and will continue to cause Plaintiffs' injuries as described herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter Judgment for Plaintiffs and provide the following relief:

(1) Declare that the CORPS' decisions to issue a Clean Water Act permit for the Ridge Road Extension, Permit No: SAJ-2011-00551 (SP-TSH), violated the APA, NEPA, and CWA;

(2) Declare that the NEPA review conducted by the CORPS in approving Clean Water Act Permit No: SAJ-2011-00551 (SP-TSH) is arbitrary, capricious, and in violation of the law;

(3) Order the CORPS to rescind Clean Water Act Permit No: SAJ-2011-00551 (SP-TSH);

(4) Order the CORPS to withdraw the Environmental Assessment, prepare a complete right of way survey with a Florida licensed Surveyor, complete a new jurisdictional determination based upon the surveyed wetlands, conduct an Environmental Impact Statement and updated mitigation analysis, and review all public comments from 2000 to the present;

(5) Preliminarily and permanently enjoin the CORPS from authorizing any further action under the permit until the CORPS fully complies with the requirements of the APA, NEPA, and CWA, including providing an opportunity for public hearing;

(6) Order the "ultimate 6-lanes" of Phase I to be in violation of the Conservation Easement;

(7) Award Plaintiffs their costs and reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and Fed. R. Civ. P. 54(d); and

(8) Award Plaintiffs any other relief that is just and proper.

**DATED:  February 6, 2020**

Respectfully submitted,

By:   *Heidi. Mehaffey*

Robert N. Hartsell, Esq.
Florida Bar No. 636207
Robert@Hartsell-Law.com
Heidi Mehaffey, Esq.
Florida Bar No. 118806
Heidi@Hartsell-law.com
ROBERT N. HARTSELL, P.A.
61 NE 1st Street, Suite C
Pompano Beach, Florida 33060
Ph: 954-778-1052