UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SIERRA CLUB and DANIEL
RAMETTA,

      Plaintiffs,

v.                                  Case No: 8:20-cv-287-CEH-JSS

UNITED STATES ARMY CORPS OF
ENGINEERS, TODD T. SEMONITE
and ANDREW KELLY,

      Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiffs Sierra Club and Daniel Rametta move for summary judgment against the United States Army Corps of Engineers, its Commander and Chief of Engineers Lt. Gen. Todd T. Semonite, in his official capacity, and the Commander and District Engineer for the Jacksonville District Colonel Andrew Kelly, also in his official capacity (the Federal Defendants).   (Plaintiffs' Motion, Dkt. 68.)  Plaintiffs challenge the decision of the Army Corps of Engineers (Corps) to issue a Clean Water Act (CWA) permit to Pasco County Board of Commissioners and the Florida Department of Transportation for the construction of the Ridge Road Extension (RRE) in Pasco County, Florida.  (*Id.*)  The RRE project spans 8.65 miles and requires fill material to be deposited over 42.40 acres of high-quality preserved wetlands.  (Dkt. 1 ¶ 1.) Plaintiffs assert that the issuance of the RRE permit violated the Administrative Procedures Act (APA), the National Environmental Policy Act (NEPA), and the

CWA. (Dkt. 1 ¶¶ 1–4.) The Federal Defendants disagree and cross-move for summary judgment. (Federal Defendants' Motion, Dkt. 82.) Additionally, the Pasco County Board of County Commissioners (Pasco County), as an intervenor/defendant, cross-moves for summary judgment on Plaintiffs' claims. (Intervenor/Defendant's Motion, Dkt. 83.) On March 30, 2022, the court conducted a hearing on the Motions. Upon consideration, and for the reasons set forth below, the court recommends that Plaintiffs' Motion be denied, and Defendants' and Intervenor's Motions be granted.

## FACTUAL BACKGROUND

The RRE is a roadway project spanning 8.65 miles and requires fill material to be deposited over 42.40 acres of wetlands, 37.37 acres of which will be permanently impacted. (AR47511, 47770.) The RRE will run for 2.6 miles through the 6,500-acre Serenova Tract of the Starkey Wilderness Preserve, which is located in Pasco County, Florida. (AR47512, 47772, 47810.) The Serenova Tract has been deemed an Aquatic Resource of National Importance (ARNI) by the U.S. Fish and Wildlife Service (FWS) and the U.S. Environmental Protection Agency (EPA). (AR132–133, 8741.) It was purchased as mitigation for the adverse impacts of the Suncoast Parkway roadway. (AR132–133, 47810.)

The RRE project consists of two phases. (AR47770.) Phase I consists of a 4.2 mile four-lane divided roadway with features such as a sidewalk, multi-use path, stormwater collection and conveyance, floodplain compensation areas, and wildlife crossings. (AR47771–47772.) Phase I also includes a full diamond interchange road junction and approximately one mile of a four-lane divided roadway, as well as a

- 2 -

perimeter exclusion fence that incorporates snake mesh to prevent snakes and small wildlife from entering the roadway.  (AR47773, 47775.)  Phase II, which is located east of the Suncoast Parkway, consists of a four-lane divided roadway.  (AR47776.)

Pasco County first applied for an extension of Ridge Road over two decades ago.  (AR2744.)  On February 2, 2000, the Corps issued a public notice under permit application number SAJ-1998-02682.  (AR778–779.)  Between 2000 and 2010, the EPA and the FWS recommended denial of the initial application, the public submitted comments regarding the initial application and requested a hearing, and the Corps requested additional information from Pasco County regarding the initial application. (AR129; AR131–138; AR3764; AR45926.)  On September 9, 2010, the Corps outlined additional information needed from Pasco County in support of the application and requested that Pasco County submit the information within 30 days.  (AR3764.)  In October 2010, Pasco County requested an extension of time to provide the additional information.  On November 5, 2010, the Corps denied Pasco County's request for additional time and withdrew the initial permit application.  (Dkt. 52-1 at 6–7.)

On February 4, 2011, Pasco County and co-applicant Florida Turnpike Enterprise (Applicants) submitted a new application, Permit Application No. SAJ-2011-00551.  (AR47780.)  On March 16, 2011, the Corps advised the Applicants that the new application was insufficient and requested that the Applicants submit an updated application:

> Upon review of the [January 31, 2011] application, the [Corps] found a significant amount of outdated, conflicting, and omitted information . . .  To address the deficiencies

> outlined in this letter and correct all outdated, conflicting, and omitted information, Pasco County should submit a revised comprehensive and current application. . . .  The Corps will publish a public notice and evaluate the project based solely on the contents of the revised submittal. Information submitted prior to January 31, 2011, which Pasco County or Florida's Turnpike Enterprise would like to be considered in this application, should be resubmitted or specifically referenced in its application.

(Dkt. 52-1 at 8–9.)

On May 31, 2011, the Applicants submitted an updated permit application. (AR165–264.)  On November 28, 2011, the Corps issued a new public notice for this application under the new 2011 permit application number.  (AR5045–5057.) The public notice explained the differences between Pasco County's old project and the new proposed project.  (AR5045–5057.)  Moreover, the public notice included the following overall project purpose:

> To improve east-west roadway capacity between US-19 and US-41 and enhance overall mobility in both west and central Pasco County in accordance with the County's current Comprehensive Plan and the Metropolitan Planning Organization's Long Range Transportation Plan. The project will also provide additional roadway capacity and improved routing away from coastal hazard areas and improve hurricane evacuation clearance times in the event of a hurricane or other major weather-related occurrence in accordance with State of Florida requirements and the County's current Comprehensive Plan.

(AR5046.)  After requesting public comment, the Corps received "roughly 1,500 comments."  (AR7709.)

Between 2011 and the date the permit was issued, the Corps asked Pasco County to provide new, updated, and other relevant information to proceed with the

permit evaluation.  (AR48097–48819.)   The Corps also advised Pasco County of various shortcomings with the information Pasco County provided and about additional information that it should provide to the various agencies conducting their review.  (AR8977–8970, 11415–11416, 13029–13031, 17082–17083, 33138, 33140, 48097–48819.)  As a result of these requests and comments, the Applicants advised the Corps in August 2018 that Phase II of the RRE project was being revised, and on September 25, 2018, the Corps issued a new public notice, still under the 2011 application number, "due to the changes in the application that would affect the public's review of the proposal."  (AR47782, 48815.)  Additional comments from the public were received and several agencies provided comments regarding the RRE. Indeed, the administrative record reflects that while evaluating Pasco County's application, the Corps coordinated with various agencies such as the FWS, the Florida Fish and Wildlife Commission, the State Historic Preservation Office, the EPA, the National Marine Fisheries Service, and the Seminole Tribe of Florida.  (AR41995, 42058, 47813, 47838–47839, 48016–48028, 45922–46079.)

On December 20, 2019, Colonel Andrew D. Kelly Jr., as Commander and District Engineer of the Jacksonville District of the Corps, approved the Corps' 264-page Environmental Assessment (EA), Public Interest Review, and Statement of Findings for the RRE application.  (AR47769–48032.)  In its EA, the Corps concluded that Pasco County's preferred route to construct the RRE, Alternative Modified 7a, is the least environmentally damaging practicable alternative (LEDPA).  (AR47965.) The Corps also determined that the RRE would not have a significant impact on the

environment.  (AR47833–47839.)  As such, the Corps determined that it did not need to prepare an Environmental Impact Statement.  (AR47834); *see also* (AR48031.)  In light of the Corps' EA and Colonel Kelly's approval, the Corps granted the CWA Section 404 Permit.  (AR47511–47702.)

On February 6, 2020, Plaintiffs filed this action, challenging the Corps' decision to issue the Permit as arbitrary, capricious, and in violation of NEPA, CWA, and the APA.  (Dkt. 1.)

## APPLICABLE STANDARDS

The Corps' decision to issue the CWA Section 404 Permit to Pasco County and the Florida Department of Transportation for the construction of the RRE project in Pasco County constitutes a final agency action subject to judicial review under the APA, 5 U.S.C.  §§ 701-706.  Under the APA, the court's review is limited to the agency's administrative record.  5 U.S.C. § 706; *Defs. of Wildlife v. U.S. Dep't of Navy*, 733 F.3d 1106, 1114 (11th Cir. 2013).

An agency's decision will be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This is an "exceedingly deferential" standard, *Fund for Animals v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996), such that a court's role is only "to ensure that the agency came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for the administrative agency's decision."  *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (citation and internal quotation marks omitted).

Agency action may be set aside only "for substantial procedural or substantive reasons as mandated by statute, not simply because the court is unhappy with the result reached." *Citizens for Smart Growth v. Sec'y of the Dep't of Transp.*, 669 F.3d 1203, 1210 (11th Cir. 2012) (quoting *Fund for Animals*, 85 F.3d at 541–42); *see also Nat. Res. Def. Council v. Nat'l Park Serv.*, 250 F. Supp. 3d 1260, 1283 (M.D. Fla. 2017) (noting "[t]his standard of review provides a court with the least latitude in finding grounds for reversal"). Particular deference is due when an agency "is making predictions, within its area of special expertise, at the frontiers of science," and thus a "court must generally be at its most deferential" in such instances. *Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*, 684 F.3d 1242, 1248–49 (11th Cir. 2012) (citation omitted). If the record supports the agency's decision, that decision should be upheld even if the record could support alternative findings. *Ark. v. Okla.*, 503 U.S. 91, 112–13 (1992). However, the "failure of an agency to comply with its own regulations constitutes arbitrary and capricious conduct," and "courts must overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself." *Simmons v. Block*, 782 F.2d 1545, 1549–50 (11th Cir. 1986) (citations omitted) (affirming decision to set aside agency action as arbitrary and capricious where agency "followed neither course of action specified in the regulations"). The party challenging the agency action bears the burden of proof. *See, e.g., Nat. Res. Def. Council*, 250 F. Supp. 3d at 1283 (citing *Druid Hills Civic Ass'n v. Fed. Highway Admin.*, 772 F.2d 700, 709 n.9 (11th Cir. 1985)).

## ANALYSIS

Plaintiffs seek review of the Corps' actions under the APA for alleged violations of NEPA and the CWA.   For the reasons discussed below, the undersigned recommends that Plaintiffs' Motion for Summary Judgment be denied, and Defendants' and Intervenor's Motions for Summary Judgment be granted.

## I.   National Environmental Policy Act (Count I)

Plaintiffs' arguments that the Corps violated NEPA fall into four main categories.   First, Plaintiffs contend the data the Corps relied on in making its determination that the RRE would not have significant impacts on the environment was "stale." (Dkt. 68 at 18–21.)   Second, Plaintiffs argue the Corps violated NEPA because it did not take a "hard look" at all cumulative impacts of reasonably foreseeable development proposals on adjacent properties to the RRE.   (*Id.* at 21–22.) Third, Plaintiffs argue that the Corps violated NEPA because the mitigation approved for the RRE was based on inadequate NEPA analysis.   (*Id.* at 22.)   And fourth, Plaintiffs contend that the Corps violated NEPA when it failed to hold a public hearing.   (*Id.*)

"Before issuing a permit allowing the discharge of dredge or fill materials into wetlands, the Corps must comply with NEPA, 42 U.S.C. §§ 4321–4370m-12; *see* 33 C.F.R. § 325.2(a)(4) and Appendix B." *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 912 (9th Cir. 2018).   NEPA "establishes a 'national policy [to] encourage productive and enjoyable harmony between man and his environment,' and

was intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321). "[I]t is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). The goal of NEPA is to "prohibit[ ] uninformed— rather than unwise—agency action." *Id.* at 351. It "is an 'essentially procedural' statute intended to ensure 'fully informed and well-considered' decisionmaking, but not necessarily the best decision." *New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 558 (1978)). NEPA "require[s] only that the agency take a 'hard look' at the environmental consequences before taking a major action." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). The Council on Environmental Quality (CEQ) promulgates regulations to promote and implement NEPA policy. 40 C.F.R. §§ 1500.1–1508.28.

Pursuant to NEPA, federal agencies must prepare a detailed statement—an Environmental Impact Statement (EIS)—in connection with "proposals for . . . major Federal actions *significantly affecting* the quality of the human environment." 42 U.S.C. § 4332(C) (emphasis added). Among other requirements, an EIS must include an explanation of "the environmental impact of the proposed action," "any adverse environmental effects which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action." 42 U.S.C. § 4332(C)(i)–(iii). The Supreme

Court has explained that an EIS is meant to "ensure [ ] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts" and that "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349.

If an agency is unsure if an EIS is required, for instance when it is unsure if the proposed project will have a *significant effect* on the human environment, it may prepare an EA to assist in making that decision. 40 C.F.R. § 1501.3–4. The purpose of an EA is to "briefly provide sufficient evidence and analysis" to determine whether the proposed action will have a significant impact. 40 C.F.R. § 1508.27. To determine whether a federal action is "significant," an agency must consider the direct, indirect, and cumulative impacts on the environment. 40 C.F.R. §§ 1508.8, 1508.27(b). If the agency determines upon completing an EA that an EIS is not necessary, it must issue a Finding of No Significant Impact (FONSI) in which it "briefly present[s] the reasons why an action . . . will not have a significant effect on the human environment." 40 C.F.R. § 1508.13. If the agency issues a FONSI, then no further evaluation of the environmental effects is required. 40 C.F.R. §§ 1508.9, 1508.13.

The court applies the arbitrary and capricious standard in reviewing the Corps' FONSI decision. *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002); *Hill v. Boy*, 144 F.3d 1446, 1450 (11th 1998). As part of this review, the court looks to the administrative record to ensure that the Corps took the requisite

"hard look" at the evidence. *Sierra Club*, 295 F.3d at 1216. "An agency [meets] its 'hard look' requirement if it has 'examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

As noted, NEPA does not mandate any particular result. "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson*, 490 U.S. at 350. It is not the role of the reviewing court to substitute its judgment for the judgment of the agency. *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996). Indeed, the APA requires courts to give substantial deference to the Corps, "not only when reviewing decisions like what evidence to find credible and whether to issue a FONSI or EIS, but also when reviewing drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue." *Ga. River Network v. U.S. Army Corps of Eng'rs*, No. 4:10-cv-267, 2012 WL 930325, at *11 (S.D. Ga. Mar. 19, 2012) (quoting *Van Antwerp*, 526 F.3d at 1361). As stated by the Eleventh Circuit, "[o]ur task ultimately, then, is to 'ensure that the agency took a "hard look" at the environmental consequences of the proposed action.'" *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1288 (11th Cir. 2015) (quoting *Sierra Club*, 295 F.3d at 1216).

As noted above, Plaintiffs raise several arguments which they contend demonstrate that the Corps violated NEPA.  The Federal Defendants and Intervenor/Defendant (collectively, Defendants) dispute these arguments and contend that the Corps complied with NEPA.

### a.  Hard Look at Environmental Impacts to Wildlife Species

Plaintiffs contend that "the Corps failed to require supplemental surveys for the NEPA review, thereby improperly minimizing the negative side effects of the RRE." (Dkt. 68 at 21.)  Specifically, Plaintiffs contend that the Corps erred in analyzing the potential impacts to wildlife by relying on outdated surveys.  (*Id.* at 20–21.) Defendants argue in response that the Corps took a hard look at potential impacts to wildlife.  (Dkt. 82 at 15–19); (Dkt. 83 at 24–28.)

As discussed above, NEPA requires an agency to take a "hard look" at the potential environmental consequences of its contemplated actions before making a final decision to proceed.  *Robertson*, 490 U.S. at 350–51.  Upon review of the administrative record, the undersigned finds that Plaintiffs have not demonstrated that the Corps failed to take a hard look at the impacts the RRE would have on wildlife. The record reflects that although surveys from 2013 were relied upon by the Applicants, the FWS indicated that the data was sufficient for its review.  (AR47869); *see also W. Watersheds Proj. v. Kenna*, No. 10-cv-1096-PHX-SMM, 2011 WL 5855095, at *7 (D. Ariz. Nov. 22, 2011) *aff'd*, 610 F. App'x 604 (9th Cir. 2015) (holding that "Plaintiff's claim that Defendants relied on stale data is not relevant to the Court's analysis of whether the agency took a hard look at the consequences of the

implemented actions."). Moreover, the fact that the Corps credited the older data does not render its decision arbitrary and capricious. *See SOSS2, Inc. v. U.S. Army Corps of Eng'rs*, 491 F. Supp. 3d 1231, 1239 (M.D. Fla. 2020) (noting that "old does not mean that the data is unreliable" and that "the Corps' decision to credit older information receives substantial deference due to the agency's expertise about the information's continuing veracity"). The record reflects that the Corps completed its evaluation of the impacts that the RRE may have on species protected by the Endangered Species Act and forwarded its findings, along with Pasco County's Biological Assessment to the FWS for the completion of a Biological Opinion. (AR39698–AR41932.) In September of 2019, the FWS issued its Biological Opinion, concurring with the Corps' evaluation of the impacts the work may have on wildlife. (AR45922–46079, 47863–47864.) The record and the EA further demonstrate that the Corps conducted a thorough review of potential impacts to wildlife, coordinated with the appropriate agencies, and implemented conditions to minimize the potential impacts to wildlife, such as fencing, wildlife crossings, walls, and bridges. (AR47773, 47823, 47864–47865, 47876, 47901, 47927, 47971–47976, 47988, 48097–48119.) As such, the undersigned finds that the Corps took a hard look at the potential impacts to wildlife and the proposed mitigation to minimize the harmful effects that would be caused by the RRE. *See Coastal Conservation League v. U.S. Army Corps of Eng'rs*, No. 4:16-cv-3008-RBH, 2016 WL 6823375, at *9 (D.S.C. Nov. 18, 2016) ("The Corps, however, is permitted to rely on information, studies, and other submissions provided by permit applicants and consultants so long as such submissions are credible and critically

evaluated by the Corps.").   The undersigned further finds that the Corps' analysis examining the scientific data and its determination that that data was reliable, and that no supplemental survey was necessary, is entitled to substantial deference under the APA.   *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989) (finding that determining what constitutes the best available scientific information or data "requires a high level of technical expertise" necessitating substantial discretion); *Balt. Gas*, 462 U.S. at 103 ("When examining this kind of scientific determination . . . a reviewing court must generally be at its most deferential.").

### b.  Cumulative Impacts of Reasonably Foreseeable Development

Plaintiffs next argue that the Corps failed to examine the cumulative impacts of reasonably foreseeable development proposals on adjacent properties to the RRE. (Dkt. 68 at 21–22.)

As explained above, NEPA requires the Corps to "examine not only the impact directly attributable to one project," but also to assess the cumulative impacts of a Section 404 permit.   *See C.A.R.E. Now, Inc. v. F.A.A.*, 844 F.2d 1569, 1574 (11th Cir. 1988); 40 C.F.R. §§ 1508.7, 1508.25(c)(3).   Pursuant to 40 C.F.R. § 1508.7, a "cumulative impact" is defined as: "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.   A cumulative impact can result from individually minor but collectively significant actions taking place over a period of time."

A meaningful cumulative impacts analysis must identify: "(1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and reasonably foreseeable proposed—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate." *St. Johns Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 462 F. Supp. 3d 1256, 1289 (M.D. Fla. 2020). Once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to ensure that the agency has considered the environmental consequences; it cannot "interject itself within the area of discretion of the executive as to the choice of the action to be taken." *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227–28 (1980) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

Plaintiffs have not shown that the Corps' cumulative impacts analysis regarding reasonably foreseeable development projects is deficient under NEPA. Rather, the record shows that the Corps considered the cumulative effects of the permit as required by NEPA and provided a meaningful analysis. For example, in its direct and indirect effect analysis, the Corps discussed the potential growth-inducing effects the RRE would have on the surrounding area. (AR47864, 47999–48015.) In doing so, the Corps discussed the planned developments, and after taking the necessary hard look, determined that the issuance of the Section 404 Permit would not have significant cumulative impacts on the surrounding area. (AR48003–48015.) Other evidence in

- 15 -

the record, such as Pasco County's Revised RRE Cumulative Impacts Analysis
Report, supports the Corps' conclusions. (AR45491–45607.)  While Plaintiffs may not
agree with the explanation provided by the Corps or the conclusions made, the court's
"only role [under NEPA] is to ensure that the agency has taken a 'hard look'" at
environmental impacts of a proposed action.  *Fund for Animals*, 85 F.3d at 546 (citation
omitted).  The undersigned finds that the Corps has met its obligation.

Moreover, to the extent Plaintiffs contend that the Corps failed in its evaluation
of indirect impacts, the undersigned finds that contention to be without merit.  In their
response to Defendant/Intervenor's Motion for Summary Judgment, Plaintiffs argue
that the Corps' failure to assess indirect impacts beyond 300 feet of the construction
was arbitrary and capricious.  (Dkt. 85 at 22–23.)  However, as noted above, the Corps
considered the growth-inducing effects of the RRE and specifically included in the EA
that "in analyzing the proposed project's indirect effects, the Corps considered impacts
that may occur as a result of the proposed RRE extending greater than 300-feet north
and 300-feet south of the construction limits." (AR47864.)  Additionally, to the extent
Plaintiffs contend that the 300-foot distance is arbitrary and capricious, the record
reflects that "[t]hree hundred (300) feet was the maximum distance included in the
tool and is often the distance associated with major transportation corridors."
(AR48000.)  The record further demonstrates that this tool was created by the Corps
to help project managers assess indirect effects. (AR48073–48096.)  As such, the
undersigned finds Plaintiffs' contention regarding the indirect impacts analysis to be
without merit.  *See Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 289

(4th Cir. 1999) ("Agencies are entitled to select their own methodology as long as that methodology is reasonable. The reviewing court must give deference to an agency's decision.")

### c. Mitigation

Plaintiffs next contend that the mitigation approved for the RRE is arbitrary and capricious as it was based on "stale surveys" and inadequate NEPA analysis. Plaintiffs' mitigation arguments are related to contentions that were analyzed in subsections (a) and (b) above. Plaintiffs failed to demonstrate that the Corps erred in relying on older data or erred in evaluating all cumulative impacts of reasonably foreseeable development proposals on properties adjacent to the RRE. Thus, Plaintiffs' mitigation argument is without merit.

Notwithstanding, the undersigned finds no error in the Corps' mitigation determination. As noted above, "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson*, 490 U.S. at 350. As part of its necessary process, NEPA requires a discussion of possible mitigation measures that can be taken to mitigate adverse environmental consequences. *Id.* at 351–52. The record shows the Corps complied with NEPA, extensively considered the project's effect, and discussed mitigation measures. For example, the EA details the consideration the Corps gave to minimizing the project's adverse impacts, which included consultation with various entities. (AR47993–47999.) The EA further discusses Pasco County's mitigation plan, which the Corps determined would neutralize the impacts to wetland functions, protect natural resources, and offset

impacts caused by cumulative effects.  (AR47785–47786, 47987–47990, 47974, 48000, 48009–48010, 48014–48015, 48021–48022.)   Lastly, the RRE Permit specifically imposes mitigation measures.  (AR47517–47518.)  *See C.A.R.E. Now, Inc. v. F.A.A.*, 844 F.2d 1569, 1575 (11th Cir. 1988) (noting that the court "must consider mitigation measures that were imposed as conditions of the Corps' action.").   Accordingly, the undersigned finds that the Corps complied with NEPA.

### d. Public Hearing

Lastly, Plaintiffs contend that the Corps violated NEPA when it failed to conduct a public hearing.  (Dkt. 68 at 22.)  The undersigned finds this contention to be without merit.  NEPA regulations require the agency to make diligent efforts to notify and include public participation on proposed actions.  40 C.F.R. § 1506.6(a)–(b); *see Sierra Club v. U.S. Army Corps of Eng'rs*, No. 3:08-cv-750-J-25TEM, 2013 WL 12203239, at *5 (M.D. Fla. Sept. 30, 2013).   The record demonstrates that the Corps issued several notices and received over 1,800 comments.  (AR5045–5057, 7709, 47782, 47817–47925. 48033–48071.)  As such, the undersigned finds that the Corps satisfied its requirements under NEPA to include public participation.  *See River Road Alliance, Inc. v. Corps of Eng'rs of U.S. Army*, 764 F.2d 445, 451 (7th Cir. 1985) (noting that the Corps "is not required to hold a public hearing before preparing an environmental assessment").  To the extent Plaintiffs contend that the Corps was statutorily required to hold a hearing under the CWA, the undersigned addresses that contention below.

Accordingly, for the reasons stated above, the undersigned finds that Plaintiffs have not carried their burden to show that the Corps violated NEPA.  Therefore, the

undersigned recommends that Defendants are entitled to summary judgment on Count I of Plaintiffs' Complaint.

## II.   Clean Water Act (Count II)

Plaintiffs next argue the Corps failed to properly assess this project under Section 404(b) of the CWA, and that such failure constitutes an arbitrary and capricious agency decision in violation of the APA.  (Dkt. 68 at 23–24.)  Specifically, Plaintiffs contend the Corps' 404(b)(1) analysis is flawed because the "administrative record is devoid of any clearly demonstrated evidence to rebut the presumption that there were practicable alternatives not involving special aquatic sites," and "[t]he selection of the RRE as the LEDPA is contrary to the evidence in the administrative record."  (*Id.*)  Plaintiffs further contend that the Corps failed to consider the importance of public participation by eschewing a public hearing.  (*Id.* at 24.)

The CWA, 33 U.S.C. § 1251 *et seq.*, is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The CWA prohibits the unauthorized discharge of pollutants (such as dredged or fill material) in the "navigable waters" of the United States without a permit from the Corps.  *Id.* § 1311 (a).  Section 404 of the CWA authorizes the Corps to issue permits "after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters," including wetlands, under specific circumstances.  33 U.S.C. § 1344.  Because the project at issue in this case involved the placement of dredged or fill material in the navigable waters of the United States, an individual Section 404 permit was required.  33 U.S.C. §§ 1311(a), 1344(a).

The Corps issues individual CWA Section 404 permits under the guidance and requirements imposed by its regulations, *see* 33 C.F.R. Pt. 320, as well as the CWA Section 404(b)(1) Guidelines developed by the EPA and the Corps, *see* 40 C.F.R. Pt. 230. The Guidelines specify that the Corps must ensure that the proposed discharge will not cause any significantly adverse effects on human health or welfare, aquatic life, aquatic ecosystems, or recreational, aesthetic, or economic values. 40 C.F.R. § 230.10(c) (1)–(4). The Guidelines prohibit the Corps from granting a permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). "If the Corps finds that the permit complies with the Section 404(b)(1) guidelines, the permit "will be granted unless the district engineer determines that it would be contrary to the public interest." 33 C.F.R. § 320.4(a)(1).

### a. Practicable Alternatives Analysis

Plaintiffs move for summary judgment contending that Pasco County failed to "rebut the presumption that there were practicable alternatives not involving special aquatic sites available to be the LEDPA." (Dkt. 68 at 23.) Plaintiffs further argue that the selection of the RRE "caused more adverse impacts to wetlands and was more costly than other alternatives, namely Alternative 10 Tower Road which was already deemed a feasible route that could meet the project purpose." (*Id.*) Stated differently, Plaintiffs seek summary judgment on their CWA claim by contending that the Corps'

analysis is flawed because there are practicable alternatives to the project and that these alternatives are presumed where special aquatic habitats will be impacted.

As noted above, the Section 404 Guidelines provide that a discharge of dredge or fill will not be permitted if, among other things, there is a "practicable alternative" to the proposed discharge that would have a less adverse impact on the aquatic ecosystem. 33 U.S.C. § 1344(b)(1); 40 C.F.R. § 230.10(a). The Guidelines provide a clear framework for determining whether an alternative to the proposed discharge is practicable.

A "practicable alternative" is one that "is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of the overall project purposes." 40 C.F.R. § 230.10(a)(2). For a project such as the RRE, the Guidelines create a rebuttable presumption that practicable alternatives are available where the activity associated with a proposed discharge would occur on a wetland and is not water dependent. 40 C.F.R. § 230.10(a)(3); *see Nat'l Wildlife Fed'n v. Souza*, No. 08-14115-CIV, 2009 WL 3667070, at *19 (S.D. Fla. Oct. 23, 2009) ("Where a project is not water-dependent, such as the one at issue in this case, it is presumed that practicable alternatives exist."). As such, the applicant must rebut the presumption by clearly demonstrating that a practicable alternative is not available. *Sierra Club v. Van Antwerp*, 362 F. App'x 100, 106 (11th Cir. 2010). "Where the presumption applies, the permit applicant bears the burden of providing 'detailed, clear, and convincing information *proving* that an alternative with less adverse impact is impracticable.'" *Id.* (quoting *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1269

(10th Cir. 2004)).  The ultimate question for the court at this stage is not whether the Corps has demonstrated a lack of practicable alternatives, but whether Plaintiff has demonstrated that the Corps' decision that Pasco County rebutted the presumption "was a clear error of judgment."  *Florida Keyes Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs*, 374 F. Supp. 2d 1116, 1154 (S.D. Fla. Apr. 11, 2005) (quoting *Alliance for Legal Action v. U.S. Army Corps of Eng'rs*, 314 F. Supp. 2d 534, 543 (M.D.N.C. 2004); *see also Black Warrior Riverkeeper, Inc. v. Alabama Dep't of Trans.*, No. 2:11-cv-267-WKW, 2016 WL 233672, at *40 (M.D. Ala. Jan. 19, 2016).

Here, the undersigned finds that the Corps did not act arbitrarily or capriciously when it found that there was no practicable alternative that would avoid any impact on wetlands.  In the EA, the Corps defined the overall project purpose as follows:

> The overall project purpose is to improve east-west roadway capacity and enhance overall mobility within the area bound by SR-52 to the north, SR-54 to the south, U.S. Highway 41 to the east, and Moon Lake Road, DeCubellis Road, Starkey Boulevard to the west, and to provide additional roadway capacity and improved routing away from coastal hazard areas and improve evacuation times in the event of a hurricane, or other major weather-related occurrence, in accordance with State of Florida requirements and the County's current Comprehensive Plan.

(AR47816.)  After defining the overall project purpose, the Corps determined that the project was not water-dependent and found that Pasco County "has demonstrated that there are no practicable alternatives that do not involve special aquatic sites," and that Pasco County's preferred alternative (Alternative Modified 7a), the RRE, "is the least environmentally damaging, practicable alternative."  (AR47966.)  In reaching these

conclusions, the Corps considered 19 proposed alternatives, including a no action alternative, and concluded that there were "no alternatives to the proposed discharge that would be less environmentally damaging." (AR47925–47966); *see also* (AR47983.) Moreover, Plaintiffs have not identified a practicable alternative that would not cause *any* impacts to special aquatic sites. As such, the undersigned finds that there was no option that could satisfy the project's purpose that would have been entitled to a presumption that it was a practical alternative. *See* 40 C.F.R. § 230.10(a)(3); *Fund for Animals, Inc.*, 85 F.3d at 543 (noting that it was unclear whether the presumption established by 40 C.F.R. § 230.10(a)(3) would ever apply in a case where there was no alternative that would avoid any impact on wetlands).

Additionally, the undersigned finds that the Corps' conclusion that the RRE was the LEDPA was not arbitrary or capricious. In concluding that the RRE was a "practicable" alternative, the Corps found:

> This alternative would satisfy the overall project purpose of improving mobility and evacuation times within the study area and would not have substantial adverse effects on the screening criteria. Alternative Mod 7a is available to the applicants, would result in improvements to mobility and evacuation within the study area, has a cost that is comparable to other practicable alternatives, would not infringe upon existing residences or businesses, and is consistent with Pasco County's LRTP. The Corps finds that Alternative Mod 7a is a practicable alternative.

(AR47943.) After determining the remaining practicable alternatives, (AR47965), the Corps concluded that the RRE was the LEDPA, noting:

> This alternative would provide improvements for both mobility and evacuation within the study area. With 28.5

acres of direct wetland impact and impacts to 470 linear feet of stream, Alternative Mod 7a would have less impact than Alternatives 3 and 5 and would have exactly the same impact as Alternative Mod 7. As previously discussed, Mod 7 and Mod 7a differ only in the functional classification of the road segment located east of the Suncoast Parkway. Classification of this road segment as an arterial roadway would allow a maximum of seven signalized intersections between the Suncoast Parkway and US Highway 41. As a result of these additional intersections, the model predicts that both mobility and evacuation times within the study area would have slight improvements, as compared to Mod 7. Additionally, Mod 7a would have the same impacts to wetlands and streams as Mod 7, but would better serve the overall project purpose due to additional improvements to both mobility and evacuation times within the study area. As such, the Corps has determined that Alternative Mod 7a is the least environmentally damaging, practicable alternative.

(AR47966.)

Although Plaintiffs contend that Alternative 10 (Tower Road) is the LEDPA – the administrative record demonstrates that the Corps performed its alternatives analysis by documenting and discussing the environmental impacts, as well as the relative costs, benefits, and detriments, of each proposed alternative. (AR47925–47966.) As Defendants correctly noted during the hearing and in their pleadings, upon concluding its analysis, the Corps determined that Plaintiffs' preferred alternative, Tower Road, was not practical as it was $7,018,000 more costly, and would provide less improvement to mobility and markedly less improvement to evacuation times than the RRE. (AR47949.) As such, Plaintiffs' contention that the Corps did not adequately select a LEDPA is belied by the record. Thus, Plaintiffs have failed to establish that the Corps acted arbitrarily or capriciously in analyzing "practicable

alternatives" to Pasco County's proposed project.  *See Fund for Animals, Inc*, 85 F.3d at 544 (holding that plaintiffs failed to carry their burden to demonstrate that the Corps' practicable alternatives analysis was arbitrary or capricious).

**b. Public Hearing**

Plaintiffs' final argument under the CWA is that the Corps violated requirements by failing to hold a public hearing.  (Dkt. 68 at 24.)  As noted, the CWA mandates an "opportunity for public hearings."  *See* 33 U.S.C. § 1344(a).  However, the statute does not state that the Corps itself must hold its own public hearings. Rather, the applicable regulations provide the Corps with discretion to hold hearings on permit applications on an "as needed" basis.  33 C.F.R. § 327.4.  Thus, if the Corps determines that it has the information necessary to reach a decision and that there is "no valid interest to be served by a hearing," the Corps has the discretion not to hold one.  *Id.* § 327.4(b).  *See Fund for Animals, Inc.* 85 F.3d at 545; *Altamaha Riverkeeper v. U.S. Army Corps of Eng'rs*, No. CV 418-251, 2020 WL 5837650, at *20 (S.D. Ga. Sept. 30, 2020).

The administrative record includes over 1,800 comments the Corps received between the time it requested comments pertaining to the 2011 re-application and when the Permit was issued, as well as the Environmental Assessment's 109-page response to those comments.  (AR47817–47925.)  To the extent Plaintiffs contend that because the project is "highly controversial and complex" a valid interest would be served by a hearing, Plaintiffs have failed to expand on that contention and therefore have not demonstrated any error in the Corps' exercising its discretion.  Indeed, as the

undersigned has previously stated, absent any evidence to the contrary, the court must presume that the Corps has acted in accordance with the law.   Upon review of the record, the undersigned finds the Corps did not act arbitrarily or capriciously in exercising its discretion to forego holding a public hearing prior to the issuance of the RRE Permit.

Accordingly, for the reasons stated above, the undersigned finds that Plaintiffs have not carried their burden to show that the Corps violated Section 404 of the CWA. Therefore, the undersigned recommends that Defendants are entitled to summary judgment on Count II of Plaintiffs' Complaint.

## CONCLUSION

Based on a thorough review of the administrative record and the foregoing analysis, the undersigned finds that the Corps complied with the APA, NEPA, and CWA when it issued the permit for the RRE project.   Accordingly, it is **RECOMMENDED**:

1. Plaintiffs' Motion for Summary Judgment (Dkt. 68) be **DENIED**.

2. Federal Defendants' Cross-Motion for Summary Judgment (Dkt. 82) be **GRANTED**.

3. Intervenor/Defendant, Pasco County Board of County Commissioners' Consolidated Motion for Summary Judgment (Dkt. 83) be **GRANTED**.

**IT IS SO REPORTED** in Tampa, Florida, on September 1, 2022.


_____
JULIE S. SNEED
UNITED STATES MAGISTRATE JUDGE


## NOTICE TO PARTIES

A party has 14 days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.

Copies furnished to:
The Honorable Charlene Edwards Honeywell
Counsel of Record