## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

SIERRA CLUB and DANIEL
RAMETTA,

      Plaintiffs,

v.                            Case No: 8:20-cv-287-CEH-JSS

UNITED STATES ARMY CORPS OF
ENGINEERS, TODD T. SEMONITE
and ANDREW KELLY,

      Defendants.

_____

### <u>ORDER</u>

      This cause comes before the Court on the Report and Recommendation ("R&R") of Magistrate Judge Julie S. Sneed (Doc. 100).  In the R&R, Magistrate Judge Sneed recommends that the Court deny the Motion for Summary Judgment of Plaintiffs Sierra Club and Daniel Rametta (Doc. 68), and grant the Cross-Motions for Summary Judgment of Federal Defendants United States Army Corps of Engineers and Scott A. Spellmon, in his official capacity as Chief Engineer and Commanding General of the Corps, and Colonel Andrew Kelly, in his official capacity as Commander and District Engineer of the Corps, (collectively, "the Corps") (Doc. 82), and Defendant-Intervenor Pasco County Board of County Commissioners ("Pasco") (Doc. 83).  Plaintiffs filed Objections to the R&R (Doc. 101), to which Defendants filed responses in opposition (Docs. 102, 103).

Upon review and consideration of the R&R, the Objections, Defendants' responses, the underlying motions, and the administrative record, the Court concludes the Objections are due to be overruled and the R&R adopted.

## I.     BACKGROUND

### A. The Administration Decision and Lawsuit

On December 20, 2019, the Army Corps of Engineers issued a permit to Pasco County and the Florida Department of Transportation pursuant to section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344(a). Doc. 1-1 at 1.  The permit was issued in connection with Pasco's longstanding efforts to construct a roadway referred to as the Ridge Road Extension ("RRE") in order to improve mobility and evacuation routes in the county. Doc. 1-13 at 2.  The RRE will span 8.65 miles, including 2.6 miles in the Serenova Tract of the Starkey Wilderness Preserve—an area designated as mitigation for the impacts of the Suncoast Parkway. Doc. 1-20 at 4, 12; Doc. 1 ¶ 12. The project requires fill material to be deposited over 42.40 acres of high-quality preserved wetlands, which will permanently impact a significant portion. Doc. 1 ¶ 1.

Plaintiffs filed this action in February 2020, asserting that the Corps' decision to issue the permit was unreasonable, arbitrary and capricious, not in the public interest, and otherwise not in accordance with federal law. *Id.* ¶ 6.  Plaintiffs allege that the issuance of the permit violated the CWA and the National Environmental Policy Act ("NEPA").  With respect to NEPA, Plaintiffs argue that the Corps relied on stale data when concluding the RRE would not significantly impact the environment, failed to take a hard look at the cumulative impact of reasonably foreseeable development

on adjacent properties, and based its mitigation on inadequate analysis. *See* Doc. 100 at 8, citing Doc. 68.  They further contend that the Corps violated section 404(b) of the CWA with respect to its analysis of the least environmentally damaging practicable alternative (LEDPA), because it failed to rebut the presumption that there were practicable alternatives that did not involve special aquatic sites, and because the selection of the RRE as the LEDPA was contrary to the evidence. *Id.* at 19.  Finally, Plaintiffs also allege that the Corps violated both statutes by failing to hold a public hearing. *Id.* at 8, 19.

### B.  The Report and Recommendation

The parties filed cross-motions for summary judgment. Docs. 68, 82, 83.  On September 1, 2022, the magistrate court issued an R&R in which it recommended denying Plaintiffs' motion for summary judgment and granting summary judgment in favor of Defendants. Doc. 100.

The magistrate court first concluded that Plaintiffs had not met their burden of proof to establish that the Corps violated NEPA.  In so finding, the court emphasized that the Corps' decisions and analyses are entitled to substantial deference, and that NEPA mandates consideration of environmental factors but not a particular result. *Id.* at 11, 15-16, 17.  In light of those principles, the record demonstrated that the Corps took the requisite hard look at the RRE's impacts on wildlife and the proposed mitigation, considered the cumulative effects of the permit, including indirect impacts, and went through the necessary process of reviewing mitigation measures. *Id.* at 12-18.

Next, the magistrate court found that Plaintiffs failed to establish that the Corps acted arbitrarily and capriciously in analyzing practicable alternatives to the proposed RRE site under the CWA. *Id.* at 20-25.  Out of the 19 sites the Corps reviewed, the court determined there was no option that could satisfy the project's purpose and that would have been entitled to a presumption that it was a practical alternative. *Id.* at 22-23.  The Corps had rejected Plaintiffs' preferred alternative, Tower Road, as the LEDPA because it was significantly more costly and would provide much less improvement to evacuation times than the RRE. *Id.* at 23-25.

Lastly, the magistrate court concluded the Corps was not required to hold a public hearing under NEPA or the CWA.  The Corps satisfied NEPA's requirement for public participation when it issued notices and received over 1,800 public comments. *Id.* at 18.  Moreover, while the CWA mandates an "opportunity for public hearings," it does not require the Corps itself to hold the hearings. *Id.* at 25.  The Corps did not act arbitrarily or capriciously in relying on the public comments. *Id.* at 25-26.

### C. Objections and Responses in Opposition

Plaintiffs filed timely Objections to three aspects of the R&R. Doc. 101.  First, Plaintiffs contend that the magistrate court erred in giving "extreme deference" to the Corps' decision to accept the Biological Opinion of the United States Fish and Wildlife Service ("FWS"), which relied on stale data. *Id.* at 1, 11-14.[1]  This reliance contradicted the FWS' previous guidance, which required current, updated wildlife

---

[1] Citations to page numbers in all documents referenced in this Order refer to the page of the document, rather than the parties' internal pagination.

surveys. *Id.* at 11-16.  A less deferential standard of review is appropriate for agency decisions that are internally inconsistent. *Id.* at 12-13.  Plaintiffs also briefly argue that the mitigation approved for the RRE was arbitrary and capricious because the Corps was required to rely on complete data, high-quality information, and accurate scientific analysis. *Id.* at 16-17.

In response to Plaintiffs' first objection, the Corps argues that the magistrate court applied the correct standard of review, which requires substantial deference to an agency decision regarding how much and what type of data is necessary to make a decision. Doc. 102 at 13-14.  Moreover, the substance of Plaintiffs' objection is directed toward alleged inconsistencies of the FWS, but the Corps' decision is the one under review. *Id.* at 14-15.  With respect to mitigation, the Corps asserts that it had a full picture of the environmental consequences of the RRE before issuing the permit. *Id.* at 15.

Pasco similarly argues that substantial deference is required by the Administrative Procedure Act, contending that Plaintiffs have provided no applicable authority for its novel view that it is not. Doc. 103 at 7-10.  Indeed, review of a decision to rely on a Biological Opinion is confined to whether a party can identify information that was not taken into account and that challenges the opinion's conclusions, which Plaintiffs have not done. *Id.* at 12.  Pasco argues that the Corps' decision to rely on the Biological Opinion was not arbitrary and capricious, and further points out that any alleged inconsistency with FWS' policy would be irrelevant to review of the Corps' decision. *Id.* at 13.  Pasco also urges the Court to reject Plaintiffs' argument about

mitigation because they fail to adequately explain and identify the portions of the R&R they are purportedly challenging. *Id.* at 14.

Plaintiffs' second objection relates to the magistrate court's finding that the Corps adequately considered the cumulative impacts of the project. Doc. 101 at 17-20. Plaintiffs contend that the administrative record demonstrates the Corps did not evaluate the impact of reasonably foreseeable developments, given that the RRE was always intended to act as an arterial roadway to support development in the area. *Id.* at 17-18. The Corps' refusal to engage in the forecasting of cumulative impacts on reasonably foreseeable development constitutes a failure to uphold its duty under NEPA. *Id.* at 20.

In response, the Corps argues that it took a hard look at the cumulative impacts of reasonably foreseeable development, just as the R&R correctly concluded. Doc. 102 at 16-18. Plaintiffs' claim that the Corps ignored the impacts is based on a single statement in FWS' Biological Opinion, but other evidence in the record demonstrates that the Corps thoroughly examined them. *Id.* at 16-17. The Corps also challenges Plaintiffs' assertion that the RRE was intended to and would lead to further development, pointing to contrary evidence in the record. *Id.* at 17-18. It contends that Plaintiffs' objection amounts to disagreement with the Corps' decision rather than a showing of error. *Id.* Pasco, too, identifies evidence in the record that it asserts demonstrates that the Corps "extensively analyzed" the RRE's cumulative effects. Doc. 103 at 15-17.

Third, Plaintiffs contend that the magistrate court erred in its conclusion that the Corps' choice of the RRE as the LEDPA was not arbitrary and capricious, because it was contrary to the evidence in the administrative record demonstrating that Tower Road was the LEDPA. *Id.* at 20-23.  The magistrate court relied on a miscalculation of wetland impact acreage in the record that was contradicted by more reliable evidence. Doc. 101 at 20-21.  Moreover, the record contained evidence that Tower Road would be far less costly than initially estimated and far less damaging to the environment than the RRE. *Id.* at 21-23.

Responding to Plaintiffs' third objection, the Corps argues that Tower Road could not have been chosen as a LEDPA because it was not practicable, a fact Plaintiffs ignore. Doc. 102 at 18-19.  The primary purpose of the project was to improve mobility and evacuation times; the Corps concluded that Tower Road would barely do so, while the RRE would lead to significant reductions. *Id.* at 19.  Tower Road would also require the acquisition of 14 homes. *Id.*  The Corps disagreed with Plaintiffs that the wetland impact estimate the magistrate court and the Corps relied on was a "miscalculation," instead arguing that it would have been unreasonable for the Corps to use Plaintiffs' preferred figure. *Id.* at 21-22.  Moreover, the data regarding Tower Road's impact and cost that Plaintiffs cite is largely outdated or irrelevant, but only serves to highlight the diligence of the Corps' analysis. *Id.* at 23-24.

Pasco echoes the Corps' response to Plaintiffs' third objection. Doc. 103 at 18-21.  It emphasizes that Tower Road was not a practicable alternative because of the project's purpose, and thus would not have been built "at any price." *Id.* at 18-19.

Pasco also challenges Plaintiffs' claim regarding the alleged miscalculation, explaining that the figure cited in the R&R was the correct one. *Id.* at 20-21.

## II.   LEGAL STANDARD

When a party makes a timely and specific objection to a magistrate judge's report and recommendation, the district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see* Fed. R. Civ. P. 72(b)(3).  The district judge may accept, reject, or modify, in whole or in part, the findings and recommendations. 28 U.S.C. § 636(b)(1)(C).   The district judge reviews legal conclusions *de novo*, even in the absence of an objection. *See Cooper-Houston v. S. Ry. Co.*, 37 F.3d 603, 604 (11th Cir. 1994); *Ashworth v. Glades Cnty. Sch. Bd. of Cnty. Comm'rs*, 379 F. Supp. 3d 1244, 1246 (M.D. Fla. 2019).

When a party seeks review of an agency decision under the Administrative Procedure Act ("APA"), the district court sits as an appellate tribunal. *See Brinklys v. Johnson*, 175 F.Supp.3d 1338, 1349 (M.D. Fla. 2016).   Summary judgment is the mechanism for deciding whether, as a matter of law, the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review. *Id.*  Under this standard, the reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  "'This standard is exceedingly deferential,' and limits our role to 'ensuring that the agency

came to a rational conclusion.'" *VHV Jewelers, LLC v. Wolf*, 17 F.4th 109 (11th Cir. 2021), quoting *Sierra Club v. Van Antwerp* ("*Antwerp I*"), 526 F.3d 1353, 1360 (11th Cir. 2008) (alterations omitted).   The court cannot conduct its own investigation or substitute its own judgment for the administrative agency's decision. *Antwerp I*, 526 F.3d at 1360.

## III.   DISCUSSION

### A. Reliance on Biological Opinion Without Updated Surveys

In Plaintiffs' first objection, they challenge the magistrate court's conclusion that the Corps took a hard look at the RRE's impacts on wildlife despite the Corps' reliance on older data. Doc. 101 at 11-16.  Specifically, Plaintiffs object to the Corps' acceptance of the FWS decision not to require updated wildlife surveys for its Biological Opinion, contrary to the Corps' earlier position and FWS' own guidelines. *Id.* at 13-16.  Plaintiffs contend that this reversal is entitled to less deference than a normal agency decision and is arbitrary and capricious. *Id.* at 12, 16.  In response, both Defendants argue that substantial deference remains the appropriate standard of review. Doc. 102 at 14; Doc. 103 at 7-10.

NEPA requires federal agencies to take a "hard look" at the environmental consequences of a proposed project. *See Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).  NEPA does not mandate particular results; provided an agency adequately identifies and evaluates a proposed action's adverse environmental consequences, the agency is permitted to decide that other values outweigh the environmental costs.

*Robertson v. Methow Valley Citizens Council.* 490 U.S. 332, 350 (1989).  The agency has met its "hard look" requirement if it "has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1216 (11th Cir. 2002) (quotation omitted).  On the other hand, it has not undertaken the requisite hard look if:

> (1) the decision does not rely on the factors that Congress intended the agency to consider; (2) the agency failed entirely to consider an important aspect of the problem; (3) the agency offers an explanation which runs counter to the evidence; or (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise.

*Id.* at 1216.

As with all administrative decisions, "a court can only find a federal agency's attempted NEPA compliance inadequate where it is arbitrary, capricious, or an abuse of discretion[.]" *Antwerp (I)*, 526 F.3d at 1361.  "This standard requires substantial deference to the agency, not only when reviewing decisions like what evidence to find credible…but also when reviewing drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue." *Id.*

When a court is reviewing an agency's decision to rely on a Biological Opinion ("BiOp") by the FWS, "the critical question is whether the…agency's *reliance* was arbitrary and capricious, not whether the BiOp itself is somehow flawed." *City of Tacoma, Wa. v. F.E.R.C.*, 460 F.3d 53, 75 (D.C. Cir. 2006) (emphasis in original).  In

the parallel context of the Endangered Species Act, the Ninth and D.C. Circuits have held that even when the underlying opinion is based on "admittedly weak" information, an agency's reliance on it will satisfy its obligations "if a challenging party can point to no 'new' information—i.e., information the [Fish and Wildlife] Service did not take into account—which challenges the opinion's conclusions." *Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1999) (citation omitted); *City of Tacoma*, 460 F.3d at 75 (citing *Pyramid Lake*).  On the other hand, "reliance on a facially flawed BiOp would likely be arbitrary and capricious." *Id.*; *see Shafer & Freeman Lakes Environmental Conservation Corp. v. Federal Energy Regulatory Commission*, 992 F.3d 1071, 1096 (D.C. Cir. 2021) ("complete failure to address an important issue" rendered opinion facially flawed); *Ergon-West Virginia, Inc. v. U.S. Environmental Protection Agency*, 896 F.3d 600, 612 (4th Cir. 2018) (agency cannot "turn a blind eye to errors and omissions apparent on the face of the report" on which it is relying).

Plaintiffs contend that the Corps acted arbitrarily and capriciously by relying on a BiOp that did not require updated wildlife habitat surveys and instead applied the results from surveys completed in 2013.  Plaintiffs do not identify any new information that challenges the Biological Opinion. *See Pyramid Lake*, 898 F.2d at 1415.  Instead, they argue that it was flawed because the 2013 surveys were no longer valid by the time it was written, and that the FWS' change in position regarding the validity of the surveys demonstrates the unreliability of its opinion.  Plaintiffs primarily rely on a 2007 FWS statement that "[i]n general, wildlife surveys for the entire proposed corridor should reflect current conditions with surveys no older than three years." AR 153, *see*

*also* AR 36392, 43454, 43726 (quoting same source).  FWS' eastern indigo snake survey protocol also states that the Service "will consider the results of the survey [] to be valid for two…years from the date of completion, unless the habitat has been significantly modified." AR 9402.  However, the FWS has also stated that it "routinely extends the validity of survey results for eastern indigos and other species if conditions within an action area have not significantly changed (i.e. major wildfire which significantly altered the landscape)." AR 33368.  Plaintiffs do not identify any significant changes to the action area's conditions or landscape.  The Court therefore disagrees that FWS' decision that updated surveys were not necessary in this case was a "change in position." *Cf.* Doc. 101 at 12;[2] *see* AR 39700 (Corps requesting that FWS notify it if additional information is needed to complete BiOp); AR 47869 (FWS indicated the data was sufficient for its review).  The BiOp was not flawed on its face, and it was not a clear error of judgment for the Corps to follow it. *See City of Tacoma*, 460 F.3d at 75.

Moreover, the Corps' wildlife habitat conclusions, relying on the BiOp, were not arbitrary or capricious.  Plaintiffs' quotations from the Corps' Environmental

---

[2] Similarly, the Corps' past requests for updated surveys are unavailing as evidence of an arbitrary and capricious change in position on the Corps' part. Most of the statements Plaintiffs cite predate the 2013 surveys, referring instead to the fact that the *prior* surveys— from more than ten years earlier, *see* AR 9386—needed to be updated. *See* Doc. 101 at 13-14, 16; *see also* AR 7729 (FWS told Corps in January 2012 that prior wildlife surveys would need to be updated).  Its later request for an "updated Biological Assessment" from Pasco did not mandate updated surveys. *Cf. id.* at 10; *see SOSS2, Inc. v. U.S. Army Corps of Engineers*, 491 F.Supp.3d 1231, 1239 (M.D. Fla. 2020) (Merryday, J.) (noting that the Corps "specifically generated [a newer] environmental assessment to refresh the scientific basis for the project…even though aspects of the project remain unaffected since earlier findings").

Assessment on this topic are taken out of context.  Most misleading is the quotation, "With much of the focus area un-surveyed, the Corps can assume similar findings with additional surveys"—a statement that referred to cultural resource surveys, not wildlife surveys. AR 48014; *cf.* Doc. 101 at 15.  Plaintiffs also criticize the Corps' conclusions that cited a lack of current data indicating the presence of scrub-jay and red-cockaded woodpecker, given the lack of updated surveys. *Id.*  With respect to the scrub-jay, however, the Corps noted that it had not been observed in the action area since 2005, which likely resulted from the fact that "much of the habitat that was once suitable for scrub-jays is…no longer suitable[.]" AR 48019.  The Corps therefore concluded that "it is highly unlikely that any viable population remains within dispersal distance of the Action Area or any part of the Starkey Wilderness Preserve," and that "recolonization is not a reasonably foreseeable outcome." *Id.*; *cf.* Doc. 101 at 13 (citing comment from a scrub-jay expert that scrub-jays may colonize new areas during a seven-year period).  Likewise, the Corps explained that red-cockaded woodpeckers have not been observed within the Starkey Wilderness Preserve since "prior to 1994," and there is "little suitable habitat" remaining there for them. *Id.* at 48019-20.  Its conclusions that cited the "absence of other current, site-specific data indicating the presence" of both species were based on the entirety of the data, not the fact that current surveys were missing. *Cf.* Doc. 101 at 15.  Contrary to Plaintiffs' arguments, these determinations were rational and reasonably explained.

The caselaw Plaintiffs cite in their contention that using older surveys is arbitrary and capricious is inapposite, because those cases involved data that was

significantly older or independently unreliable. *See* Doc. 101 at 12, citing *Northern Plains Resource Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1086 (9th Cir. 2011) (agency failed to take a hard look when it failed to conduct on-the-ground surveys and instead relied on aerial surveys that were between ten and 20 years old); *Lands Council v. Powell*, 395 F.3d 1019, 1031 (9th Cir. 2005) (13-year-old habitat surveys of trout species were "too outdated to carry the weight assigned" to them, and agency's reliance on *non-habitat* surveys that were at least six years old was "suspect"); *see Ecology Center v. Castaneda*, 574 F.3d 652, 665 (9th Cir. 2009) (characterizing the data in *Land Council* as "fifteen years old, inaccurate, and insufficient on many variables."). Plaintiffs have not identified any deficiencies in the wildlife habitat surveys in this case aside from their age, and the administrative record demonstrates that Pasco followed FWS' recommended protocol in conducting the surveys. *See, e.g.*, AR 39868.[3]  In all, as in *SOSS2, Inc. v. U.S. Army Corps of Engineers*, 491 F.Supp.3d 1231, (M.D. Fla. 2020), Plaintiffs have not provided sufficient reason to doubt the accuracy of the data the Corps relied on such that its reliance signifies a failure to take a hard look.

---

[3] Additionally, in a closely related context, the Code of Federal Regulations instructs agencies to supplement an Environmental Impact Statement if "[t]he agency makes substantial changes to the proposed action that are relevant to environmental concerns," or there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. 1502.9(d)(1); *see* Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 FR 18026-01, 18036 (1981) (agency should "carefully reexamine[] an Environmental Impact Statement that is more than five years old to determine if it must be supplemented based on the 1502.9 factors).  Here, although the surveys were more than five years old, Plaintiffs have not identified any "significant new circumstances or information" that would require new action.

In agreeing with the magistrate court that the Corps' decision to rely on the Biological Opinion was not arbitrary and capricious, this Court affords significant deference to the Corps, as it must. *See BBX Cap. v. Fed. Deposit Ins. Corp.*, 956 F.3d 1304, 1314 (11th Cir. 2020) (the APA standard of review is "exceedingly deferential") (quotation omitted). Plaintiffs contend that a lesser standard of review is warranted when an agency acts inconsistently with an internal guideline, Doc. 101 at 12, but it is not clear which agency or guideline they are referring to. As discussed, the Court finds that the Corps—the agency whose decision is being reviewed—did not contradict its own guidelines. *See supra* n.2. Plaintiffs' assertion that the standard of *Chevron* deference has been lessened in recent Supreme Court jurisprudence, *id.* at 5, 8, also has ambiguous applicability to the instant appeal, which is reviewing an agency decision rather than an agency's interpretation of a statute. *See* Doc. 103 at 8-9. Plaintiffs have not established that the standard of review has changed in the context of this action. *See Black Water Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 833 F.3d 1274, 1285 (11th Cir. 2016) ("The arbitrary and capricious standard is a highly deferential one, and we cannot substitute our judgment for that of the agency as long as the agency's conclusions are rational and reasonably explained...Our inquiry is limited by law to whether the agency's decision was based on a consideration of the relevant factors and, ultimately, whether it made a clear error of judgment.") (quoting *Antwerp (I)*, 526 F.3d at 1360). The Court does not find that the Corps made a clear

error of judgment or that it failed to take a hard look when it relied on the Biological Opinion.  Plaintiffs' first objection is therefore due to be overruled.[4]

## B. Cumulative Impacts Analysis

In Plaintiffs' second objection, they argue that the Corps did not adequately consider the RRE's cumulative impacts because it failed to evaluate the effects of reasonably foreseeable development. Doc. 101 at 17-24.  Plaintiffs contend that the project was always intended to support the region's development, which, because it was already occurring, was not unduly speculative. *Id.* at 17-18.  Both Defendants respond that the record demonstrates the Corps did consider reasonably foreseeable development. Doc. 102 at 16-18; Doc. 103 at 15-17.  The Corps further asserts that it reasonably concluded development of adjacent lands did not depend on the RRE. Doc. 102 at 17-18.

NEPA requires a federal agency to examine the cumulative impacts of a proposed project in connection with any other action. *City of Oxford, Ga. v. F.A.A.*, 428 F.3d 1346, 1353 (11th Cir. 2005).  A cumulative impact is "the impact on the

---

[4] Plaintiffs also assert, briefly, that the mitigation approved for the RRE is arbitrary and capricious because it was based on an inadequate NEPA analysis. Doc. 101 at 16-17.  While not entirely clear, this argument appears to be based on the lack of updated surveys as well. *See* Doc. 100 at 17-18.  Plaintiffs have not identified an error in the magistrate court's finding on this topic other than their disagreement with it. *See* Fed. R. Civ. P. 72(b)(2) (requiring "specific" objections); *Cooper v. PHEAA*, 820 Fed. App'x 861, 865 (11th Cir. 2020) ("Objections to a magistrate judge's findings or recommendations must be specific."); *Palavicini v. Wal-Mart Stores East, LP*, 787 Fed. App'x 1007, 1012 (11th Cir. 2019) ("objection was not clear or specific enough" to preserve issue for appeal).  For the reasons detailed in the R&R, the Court agrees with the magistrate court that the Corps' mitigation determination was not arbitrary or capricious.

environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such actions." 40 C.F.R. § 1508.7.  Cumulative effects can be both direct and indirect. *Id.* at § 1508.8.  Indirect effects may include "growth inducing effects and other effects related to induced changes in the pattern of land use, population density, or growth rate[.]" *Id.*

"By 'reasonably foreseeable,' the regulations mean effects that are sufficiently likely to occur that a person of ordinary prudence would take them into account in reaching a decision." *Ctr. for Biological Diversity v. U.S. Army Corps of Engineers*, 941 F.3d 1288, 1293 (11th Cir. 2019), quoting *EarthReports, Inc. v. FERC*, 828 F.3d 949, 955 (D.C. Cir. 2016) (modifications accepted).  The Eleventh Circuit observed that restricting the analysis to foreseeable actions "ensures that the details of these actions are sufficiently concrete for the agency to gather information useful to itself and the public." *City of Oxford*, 428 F.3d at 1353-54.  Otherwise, "investigators and researchers would be forced to analyze the environmental impact of a project, the parameters and specifics of which would be a mere guess." *Id.* at 1356; *see also Kleppe v. Sierra Club*, 427 U.S. 390, 402 (1976) ("Where no…plan exists, any attempt to produce an impact statement would be little more than …[an] estimate[] of potential development and attendant environmental consequences.").

The Counsel on Environmental Quality (CEQ) described an agency's obligation as follows:

> The EIS must identify all the indirect effects that are known, and make a good faith effort to explain the effects that are not known but are "reasonably foreseeable." … It will often be possible to consider the likely purchasers and the development trends in that area or similar areas in recent years; or the likelihood that the land will be used for an energy project, shopping center, subdivision, farm or factory. The agency has the responsibility to make an informed judgment, and to estimate future impacts on that basis, especially if trends are ascertainable or potential purchasers have made themselves known. The agency cannot ignore these uncertain, but probable, effects of its decisions.

*Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 FR 18026-01 (1981).  The Fifth Circuit has interpreted the reasonable foreseeability standard as requiring "a substantial degree of certainty." *See Medina Cnty. Environmental Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687 (5th Cir. 2010).[5]

Applying the above principles, the Eleventh Circuit concluded in *City of Oxford* that the Federal Aviation Administration was not required to consider the impact of a future road relocation or construction of a new airport terminal in its cumulative impacts analysis, because neither action was reasonably foreseeable. 428 F.3d at 1356. There was "simply not enough evidence" that either event would ever occur to

---

[5] The First Circuit has suggested questions an agency or court may consider to determine whether impacts are reasonably foreseeable:

> With what confidence can one say that the impacts are likely to occur? Can one describe them 'now' with sufficient specificity to make their consideration useful? If the decisionmaker does not take them into account 'now,' will the decisionmaker be able to take account of them before the agency is so firmly committed to the project that further environmental knowledge, as a practical matter, will prove irrelevant to the government's decision?

*Sierra Club v. Marsh*, 769 F.2d 868, 878 (1st Cir. 1985) (citation omitted).

necessitate the assessment of their environmental impacts, given that there was "no concrete plan to consider and little indication" that the construction would occur. *Id.* at 1354, 1356.  The court noted that if a construction project were proposed in the future, the agency "may then be required to analyze the cumulative impacts of that project in conjunction with the project currently at issue." *Id.* at 1356 n.23.  Similarly, the court in *Georgia River Network v. U.S. Army Corps of Engineers (I)* concluded any additional impacts analysis was too speculative where "[n]othing on the record reveal[ed] any plans or proposals to develop," and further development would require a Section 404 permit. 334 F.Supp.2d 1329, 1345 (N.D. Ga. 2003); *see also Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 914 F.2d 1174, 1181-82 (9th Cir. 1990) (further development caused by access road construction was too speculative, where there were no plans in place and future uses were only conceivable rather than likely); *Georgia River Network v. U.S. Army Corps of Engineers (II)*, No. 4:10-cv-267, 2012 WL 930325, *40 (S.D. Ga. March 19, 2012), *aff'd*, 517 F. App'x 699 (11th Cir. 2013) (alleged impacts were speculative where "no concrete development plans or proposals were before the Corps to review or consider"); *City of Shoreacres v. Waterworth*, 332 F.Supp.2d 992, 1008 (S.D. Tex. 2004), *aff'd*, 420 F.3d 440 (5th Cir. 2005) (rejecting argument that future construction was reasonably foreseeable just because it was technically possible, where there was no plan or proposal in place and it would require congressional authorization).

    In contrast, in *Florida Wildlife Federation v. U.S. Army Corps of Engineers*, the court concluded additional development was a reasonably foreseeable effect of a project that

included a road extension, where "one need only review the map of the proposed site in context to see that" the proposed road would "ultimately require a connection through an area on what the parties agree includes high value wetlands." 401 F.Supp.2d 1298, 1315 (S.D. Fla. 2005). Emphasizing that the road was originally planned to extend through the wetlands, the court observed it was "clear that the full benefit of this road is realized only when it is extended." *Id.* at 1316. The Corps was therefore required to consider the impact of a future extension in determining whether to issue the current permit. *Id.*

Likewise, in *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, the court held that the Corps was required to consider secondary development that would occur from casino construction project, because "increased growth in the area is the only reasonable prediction of what will occur if the casinos are built." 109 F.Supp.2d 30, 41 (D.D.C. 2000). Given that economic development was "an announced goal and anticipated consequence" of the project, it could not be considered "highly speculative" as the Corps claimed. *Id.*; *see also Sierra Club v. Marsh*, 769 F.2d 868, 878-79 (1st Cir. 1985) (agency was required to consider impacts of further development of an island caused by a project to build a causeway from the mainland, where it was "nearly impossible to doubt" that such development would occur as a result of the causeway and the record contained detailed descriptions of the likely development).

Causation is another question an agency or court must resolve when identifying cumulative impacts. NEPA requires a "reasonably close causal relationship" between the environmental effect and the alleged cause; only indirect effects that would be

proximately caused by the permitted action require consideration. *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004); *see also Center for Biological Diversity v. U.S. Army Corps of Engineers*, 941 F.3d 1288, 1295 (11th Cir. 2019) (rejecting but-for causal relationship as too attenuated to constitute an indirect effect).  In *C.A.R.E. Now, Inc. v. F.A.A.*, 844 F.2d 1569, 1575 (11th Cir. 1988), for example, the Eleventh Circuit found that any increased growth at an Atlanta airport would not be attributable to the proposed runway extension project, but rather was "inevitable…given the projected growth of Atlanta and the strain on" its primary airport.  As such, the agency's limited analysis of the project's cumulative effects was warranted. *Id.*; *see also City of Shoreacres*, 332 F.Supp.2d at 1007 (agency was not required to consider hypothetical deepening of a ship channel among the proposed project's cumulative impacts, because the project was not predicted to cause enough of the channel's forecasted growth to create the necessity for deepening it); *cf. Marsh*, 769 F.2d at 878 (building a causeway to island would be the clear cause of the island's commercial growth); *Florida Wildlife Federation*, 401 F.Supp.2d at 1326 (the record could only support the conclusion that the project would be "growth inducing" were there was no evidence any development of the area had been contemplated irrespective of the project).

Finally, the agency's consideration of the cumulative impacts of reasonably foreseeable effects must be fulsome to satisfy NEPA.  In *Conservancy of Sw. Florida, Inc. v. Williams*, 13-14477-CIV, 2018 WL 11422990, *9 (S.D. Fla. Dec. 21, 2018), the court found the Corps satisfied its obligations when it "devoted 12 pages of its environmental assessment to discussion of the cumulative and secondary impacts of the Project,"

recognizing and discussing in detail various environmental issues in the context of other projects in the area.  The court further concluded that it was not arbitrary and capricious for the Corps to discuss only projects that had received permits at the time of its decision, but not those that had been proposed but not permitted. *Id.*; *see also D'Olive Bay Restoration & Pres. Comm., Inc. v. U.S. Army Corps of Engineers*, 513 F.Supp.2d 1261, 1294 (S.D. Ala. 2007) (Corps "extensively discussed impacts from past, present and future projects," expressly took into account that it expected the public would continue to apply for section 404 permits, and concluded the project would not add to any preexisting water quality impairments); *cf. Sierra Club v. U.S. Army Corps of Engineers*, No. CV H-11-3063, 2012 WL 13040281, *15 (S.D. Tex. Aug. 22, 2012) (it was arbitrary and capricious for Corps "to recognize future development in one section of [its] report, but, in another, not acknowledge that analysis and assert that future development is too speculative"); *Florida Wildlife Federation*, 401 F.Supp.2d at 1326 (Corps' bare statements that it was "aware" that future development may occur and that the project "may entice" further development constituted "grossly inadequate consideration of the reasonably foreseeable indirect effects" of issuing a permit); *Western North Carolina Alliance v. N.C. Dep't of Transp.*, 312 F.Supp.2d 765, 773 (E.D. N.C. July 1, 2003) (inadequate consideration of cumulative impacts where report merely described other projects but did not analyze their impacts).

Here, the Court agrees with the magistrate court that the Corps fulfilled its cumulative impacts obligations under NEPA, and rejects Plaintiffs' characterization that it refused to consider the effects of reasonably foreseeable projects and

development. Doc. 101 at 18, 20.  The Corps' cumulative impacts analysis spanned 16 pages of its Environmental Assessment, thoroughly discussing the environmental impact of development on two watersheds between 1980 and 2030. AR 47999-48015. The Corps expressly considered "the potential development effects associated with the roadway," acknowledging that the RRE "is likely to increase accessibility to the area." AR 48001.  It emphasized, however, that, irrespective of the RRE, "the general area is trending toward development of the remaining available lands," as Pasco County has increasingly become home to bedroom communities for Tampa workers. AR 48006, 48009-10.  Based on its review of Pasco's 2025 Plans and Long-Range Transportation Plans as well as permits for existing projects, the Corps found "it can be easily assumed that the land area" surrounding the RRE "will be developed" whether the RRE is constructed or not. AR 48000, 48009; *see* AR 47852 (explaining why future development of adjacent lands is not dependent on the RRE); *cf. Florida Wildlife Federation*, 401 F.Supp.2d at 1326 (no evidence growth would occur without project).  It therefore concluded that construction would not *induce* development or notably alter the nature of the developments that have already been proposed. AR 48001.

Plaintiffs highlight the fact that the RRE permit application was amended to allow for up to seven signalized interchanges with a designation as an arterial roadway, [6] arguing that the RRE was always intended to support the area's

_____

[6] An arterial roadway is a type of limited access highway that provides a high degree of mobility, as compared to a collector or local road that provides access to residential areas or

development. Doc. 101 at 17-18.  But, even assuming Plaintiffs are correct about the project's intent,[7] supporting development that would occur either way is not the same as causing it.  And Plaintiffs fail to point to any evidence demonstrating that the Corps' determination that the development would occur either way is incorrect.  The Court instead finds that this determination is supported by a reasoned analysis and is not arbitrary or capricious. *See C.A.R.E. Now*, 844 F.2d at 1575 (upholding agency's finding that project would have limited effects because growth was inevitable).

Moreover, regardless of causation, the administrative record contradicts Plaintiffs' contention that the Corps declined to consider the cumulative impacts of reasonably foreseeable development. Doc. 101 at 18-19.   The Corps' cumulative impacts analysis discussed the specifications of all projects that had already been granted a permit. AR 48001, 48009-10; *see Florida, Inc.*, 2018 WL 11422990 at *9 (agency reasonably limited its discussion to permitted projects).  Its statement that it "cannot approximate future wetland impacts from the conceptual permits or County comprehensive plans," and its refusal to guess the specific impacts of signalized interchanges whose locations had not even been proposed, are fully in line with its statutory responsibilities. AR 48009-10; *cf.* Doc. 101 at 19; *see City of Oxford*, 428 F.3d

---

businesses at reduced speeds. *See* "Road Function Classifications," Federal Highway Administration, Nov. 2000, *available at* https://safety.fhwa.dot.gov/speedmgt/data_facts/do cs/rd_func_class_1_42.pdf.  Thus, the RRE's designation as an arterial roadway does not itself indicate an intent to support the local traffic that would result from further development.
[7] Pasco explained that the amendment to allow for signalized interchanges was made "to make the permit application and review consistent with the most likely development scenario," as it was "reasonably foreseeable" the new owner [of an adjacent parcel] would request access to [the] RRE" AR 35607, 35610.

at 1356 (agency is not required to evaluate the impacts of a project whose parameters or specifications could only be guessed). But Plaintiffs ignore a broader point: the Corps' cumulative impacts conclusions were based on its assumption that the area would become fully developed. AR 48009-10, 48011 (acknowledging that development would reduce the availability of wildlife habitat, pushing species to preservation and conservation areas); *see D'Olive Bay*, 513 F.Supp.2d at 1294 (Corps' conclusion expressly accounted for expectation that public would continue to fill waterways). There is simply no evidence that the Corps rejected the existence of future development as an "unforeseeable crystal ball inquiry," as Plaintiffs claim. Doc. 101 at 19.

The Corps' overall conclusion that the RRE's incremental contribution to the environmental effects of development would not be significant was not arbitrary or capricious. Despite the significant development of the area's watersheds that has already taken place since 1980, the Corps explained that "the loss of wetlands has been fairly minimal" and "the area has seen an increase in the acreage of surface waters" as the result of laws requiring mitigation of impacted wetlands. AR 48006-07. Its emphasis on the necessity of permits and mitigation in discussing the predicted impacts of future projects was therefore reasonable, and did not reflect any shirking of obligations. *Cf.* Doc. 101 at 15-16; *see City of Oxford*, 428 F.3d at 1356 n.23 (noting that agency would be required to analyze the cumulative impacts of future projects that were proposed in conjunction with the current one as permit applications were filed). With respect to wildlife habitats, the Corps concluded the cumulative impacts of the

RRE and other local developments would be minimal because of the avoidance and minimization of habitat loss that has been successfully employed in other projects and that is planned for the current ones, including the RRE. AR 48011; *C.A.R.E. Now, Inc. v. F.A.A.,* 844 F.2d 1569, 1575 (11th Cir.1988) ("When mitigation measures compensate for otherwise adverse environmental impacts, the threshold level of 'significant impacts' is not reached[.]").  It is simply inaccurate to say that the Corps refused to analyze the cumulative impacts on wildlife. *Cf.* Doc. 101 at 19.[8]  Plaintiffs' second objection is due to be overruled.

---

[8] Plaintiffs give outsize significance to one sentence in the FWS' Biological Opinion as evidence that the Corps declined to consider reasonably foreseeable effects.  On review, the Court agrees with Defendants that this line is taken out of context.  Before stating, "There are no proposed developments at this time," the FWS acknowledged that "indigo snakes could be impacted as a result of development of [] properties…that may request access to the extension, although access to all other properties that may be developed in the future could be obtained through existing roadways." AR 45934; *see also* AR 45944 (recognizing same potential for impacts, but explaining "[t]here are no proposed developments at this time and the Service does not have any information to analyze the effects of these future actions on the indigo snake.").  The FWS, like the Corps, cannot evaluate the effects of projects whose "parameters and specifics…would be a mere guess." *City of Oxford*, 428 F.3d at 1354.  However, the FWS went on to explain,

> Future development around the Starkey Wilderness Area will result in limiting the amount of habitat that is available for indigo snakes and their movement or dispersal…to other suitable areas.  Within the Action Area will be an increase in buildings, roads, and associated infrastructure, all of which have the potential to have indirect adverse effects on indigo snakes. …However, these cumulative effects are difficult to quantify because we cannot predict where or when they might occur and we cannot specifically attribute adverse impacts to any one particular project… In the future, these factors will probably work synergistically against indigo snakes and we expect that these negative impacts will significantly reduce the number of indigo snakes in the area.

AR 45945.  The FWS concluded in its final opinion that the RRE itself was not likely to jeopardize the indigo snake's continued existence because of the mitigation measures that

### C. The Selection of the RRE as the LEDPA

In Plaintiffs' last objection, they argue that the Corps' selection of the RRE as the LEDPA instead of Tower Road was arbitrary and capricious because the record demonstrates that Tower Road was less costly and far less damaging to the environment than the RRE. Doc. 101 at 21-23. Plaintiffs contend that the magistrate court erred in concluding otherwise based on a miscalculation in the record. *Id.* at 20-21. Both the Corps and Pasco dispute Plaintiffs' claim of a miscalculation, but argue that, in any event, Tower Road was not a practicable alternative. Doc. 102 at 18-24; Doc. 103 at 18-21.

Under the CWA, the Corps is not permitted to grant a Section 404 permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). If the "project's basic purpose" is not "water dependent," then the Corps must presume that a practicable alternative that has a less environmental impact on the wetland is available. *Id.* § 230.10(a)(3). The applicant must then provide "detailed, clear, and convincing information *proving* that an alternative with less adverse impact is impracticable." *Sierra Club v. Van Antwerp* ("*Antwerp II*"), 362 F. App'x 100, 106 (11th

---

would be taken; the Corps relied on this conclusion in its own analysis. AR 48017-18 (summarizing FWS' conclusion). Reviewing the full context of the Biological Opinion and the Environmental Assessment, it is clear that neither the FWS nor the Corps shirked its responsibility to consider the cumulative impacts of the RRE and other development on wildlife habitats.

Cir. 2010), quoting *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1269 (10th Cir. 2004) (emphasis in original). Here, the project's basic purpose—building a road—is not water-dependent. AR 47816. Accordingly, Pasco was required to prove that any alternatives with less adverse environmental impact than the RRE were not practicable.

An alternative is practicable "if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2). To determine whether an alternative is practicable, "the Corps must first determine the overall project purpose," which entails consideration of "the applicant's purpose" and "the objectives of the applicant's project." *Friends of Santa Clara River v. United States Army Corps of Engineers*, 887 F.3d 906, 912 (9th Cir. 2018) (quotations and citations omitted). Because the CWA does not require the Corps to use any particular metric for assessing alternatives in light of their "cost, existing technology, and logistics," the Court will defer to the Corps' evaluation of those factors as long as it is reasonable. *Friends of Santa Clara River*, 887 F.3d at 922; *see also National Wildlife Federation v. Whistler*, 27 F.3d 1341, 1344 (8th Cir. 1994) (record indicated Corps considered alternative but dismissed it as inadequate because it was not functional for the applicant's needs).

For example, in *City of Shoreacres v. Waterworth*, 420 F.3d 440, 449 (5th Cir. 2005), the Fifth Circuit upheld the Corps' determination that appellants' preferred alternatives were not practicable, because they would not comport with the overall project purpose of expanding the county's port capabilities. Similarly, the Ninth

Circuit found that the Corps did not err in rejecting alternatives sites upon its determination that they would not satisfy the project's purpose of "obtain[ing] specific minerals…to support…industry needs in national and world markets" in *Jones v. National Marine Fisheries Service*, 741 F.3d 989, 1002 (9th Cir. 2013); *see also Altamaha Riverkeeper v. United States Army Corps of Engineers*, 355 F.Supp.3d 1181, 1188-89 (S.D. Ga. 2018) (Corps' alternatives analysis was not arbitrary or capricious where it found appellant's preferred alternative was not practicable in light of project's purpose of protecting a certain area from erosion, because it covered a different area and would result in only temporary protection); *Stewart v. Potts*, 996 F.Supp. 668, 675-76 (S.D. Tex. 1998) (where project's purpose was to build an affordable public golf course for city residents, Corps was within its discretion to conclude alternatives located outside of the city were not practicable).

Here, the Court agrees with the magistrate court that the Corps' evaluation of the alternative sites' practicability in light of the overall project purpose was reasonable. The Corps defined the overall project purpose as follows:

> [T]o improve east-west roadway capacity and enhance overall mobility within the area bound by SR-52 to the north, SR-54 to the south, U.S. Highway 41 to the east, and Moon Lake Road, DeCubellis Road, Starkey Boulevard to the west, and to provide additional roadway capacity and improved routing away from coastal hazard areas and improve evacuation times in the event of a hurricane, or other major weather-related occurrence, in accordance with State of Florida requirements and the County's current Comprehensive Plan.

AR 47816. As Plaintiffs noted in their response in opposition to Defendants' cross-motions for summary judgment, the Corps declined Pasco's request to narrow the

project purpose to the creation of a "*centrally-located* arterial roadway," AR 13945 (emphasis added), which would have eliminated several of the proposed alternatives to the north and south of the identified region, including Tower Road. Doc. 85 at 26-27;[9] *see Friends of Santa Clara River*, 887 F.3d at 912 ("The permit applicant may not define the project purpose narrowly in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable.") (quotations omitted).   Plaintiffs do not challenge the Corps' definition of the overall project purpose on appeal.

Armed with this definition, the Corps conducted an extensive evaluation of 19 alternatives, including the "no-action alternative,"[10] the RRE, and Tower Road. AR 47928-66.  Of those 19, the Corps identified only four that were both reasonable and practicable. *Id.* at 47965.  Its detailed memorandum reveals that two considerations dominated its determination of practicability: whether the alternative would significantly reduce evacuation time, and whether it would require the acquisition of

---

[9] Plaintiffs also pointed out that the Corps, in the same correspondence, made a determination that Tower Road was practicable. Doc. 85 at 26-27.  Plaintiffs are correct that the Corps declined Pasco's request to eliminate several alternatives from the required analysis, including Tower Road, and directed it to proceed in analyzing all existing alternatives because "the practicable alternatives have already been identified for this project." AR 13948.  However, the Court finds that the Corps was not bound by this prior determination, nor did it abuse its discretion when it later concluded, based on a more detailed analysis and more complete information, as described *infra*, that many of the alternatives were not practicable after all. On the contrary, that the Corps required a complete analysis of a list that turned out to be over-inclusive demonstrates its strict compliance with the CWA guidelines.

[10] The "no action alternative" is a comparative tool that analyzes the same list of factors used to assess all alternatives based upon a scenario in which the project is not undertaken or is completed in such a way that it does not impact the waters of the United States. AR 47928.

private property.  The four alternatives the Corps determined to be practicable would each significantly reduce evacuation time—from 23.4 hours to 16.8 hours—and would not impact or require the acquisition of any private property.  The only other alternative to satisfy those two criteria, Alternative 6, was eliminated because it was almost twice as expensive. *Id.* at 47937-38.  Included on the list of rejected alternatives was Tower Road ("Alternative 10"), which would require the acquisition of 14 residences, would infringe on the boundaries of 21 private properties, and would only reduce evacuation time to 21.8 hours. *Id.* at 47948-49.  The Corps concluded that such a marginal improvement to evacuation time did not overcome its drawbacks, rendering it impracticable. *Id.*

The Corps' focus on evacuation time in determining practicability is fully consistent with the overall project purpose of improving east-to-west mobility and routing away from the coasts.  The Corps was therefore within its discretion to conclude alternatives that did not significantly reduce evacuation time were not practicable. *See Waterworth*, 420 F.3d at 449; *Jones*, 741 F.3d at 1002.  Moreover, the weight the Corps gave to private property rights falls within the statute's directive to assess the "logistics" of any alternative, and is not unreasonable. *See Friends of Santa Clara River*, 887 F.3d at 922; *see also C.A.R.E. Now, Inc. v. F.A.A.*, 844 F.2d 1569, 1574 (11th Cir. 1988) ("Our task is not to choose the best alternative, but to ascertain that the FAA made a "reasoned choice" among these alternatives.").  The Corps therefore did not abuse its discretion in eliminating Tower Road as impracticable.

In arguing otherwise, Plaintiffs ignore these two factors—and the entire practicability question—and instead assert that Tower Road was the LEDPA because it was significantly less expensive and would have substantially less impact on the environment than the RRE. Doc. 101 at 22-23.   Plaintiffs dispute the Corps' calculation that Tower Road would cost seven million dollars more than the RRE, another reason for its impracticability on which the magistrate court relied. *Id.* at 20-23.   The Corps and Pasco, in turn, challenge Plaintiffs' calculation of costs and environmental damage.  Doc. 102 at 20-21; Doc. 103 at 23-24.  But the Court need not resolve this dispute, because the Corps' finding that Tower Road was impracticable did not depend on its cost.  The Court therefore concludes that the Corps' selection of the RRE as the LEDPA instead of Tower Road was neither arbitrary nor capricious.  Plaintiffs' third objection is due to be overruled.

## IV.   CONCLUSION

Upon a *de novo* review, the Court concurs with the magistrate court's findings and conclusions of law in the Report and Recommendation.   The Court further concludes that Plaintiffs' Objections are due to be overruled.  Defendants are entitled to summary judgment in their favor.

Accordingly, it is **ORDERED**:

1. Plaintiffs Sierra Club and Daniel Rametta's Objections to the Report and Recommendation (Doc. 101) are OVERRULED.

2. The Report and Recommendation entered by United States Magistrate Judge Julie S. Sneed on September 1, 2022 (Doc. 100) is adopted, confirmed,

and approved and is made a part of this Order for all purposes, including appellate review.

3. Plaintiffs' Motion for Summary Judgment (Doc. 68) is DENIED.

4. Federal Defendants', United States Army Corps of Engineers, Scott A. Spellmon, in his official capacity as Chief Engineer and Commanding General of the Corps, and Colonel Andrew Kelley, in his official capacity as Commander and District Engineer of the Corps, Cross-Motion for Summary Judgment (Doc. 82) is GRANTED.

5. Defendant-Intervenor Pasco County Board of County Commissioners' Cross-Motion for Summary Judgment (Doc. 83) is GRANTED.

6. The Clerk is directed to enter judgment in favor of Defendants, terminate any pending motions, and close this case.

**DONE** and **ORDERED** in Tampa, Florida on January 20, 2023.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties